In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1758

XUE JUAN CHEN,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A099-934-505.

ARGUED OCTOBER 8, 2013 — DECIDED DECEMBER 11, 2013

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges*.

POSNER, *Circuit Judge*. Once again we confront a challenge to the denial by the Board of Immigration Appeals of asylum to a Chinese woman whom the government wants to deport to China's Fujian Province. She claims to face a significant risk of persecution there because, since coming to the United States in 2002, she has given birth to two children in violation of China's one-child policy (the official designation is

"family planning policy"). For similar cases see, e.g., *Li Ying Zheng v. Holder*, 722 F.3d 986 (7th Cir. 2013); *Qiu Yun Chen v. Holder*, 715 F.3d 207 (7th Cir. 2013); *Xiu Zhen Lin v. Mukasey*, 532 F.3d 596 (7th Cir. 2008).

Recently the Chinese government announced that it's relaxing the one-child policy—it will permit an urban husband and wife at least one of whom was an only child to have two children. See, e.g., Chris Buckley, "After Decades, China Will Ease One-Child Policy," *New York Times*, Nov. 16, 2013, p. A1, www.nytimes.com/2013/11/16/world/asia/china-to-loosen-its-one-child-policy.html (visited—as were all the websites cited in this opinion—on December 10, 2013). The petitioner's husband is not an only child; the petitioner testified without contradiction that her mother-in-law was punished for violating the one-child policy. There is no indication whether the wife is an only child. There is also no indication that the new policy will be applied retroactively. Moreover, Fujian Province, as we have pointed out in previous cases (most recently in *Qiu Yun Chen v. Holder, supra*, 715 F.3d at 209–10, 212), appears to march to its own beat, enforcing the one-child policy more strictly than existing Chinese law appears to permit. This makes it uncertain whether the petitioner will benefit from the new policy of the central government—a policy moreover merely announced and not yet implemented. (Chris Buckley's article, *supra*, quotes a Chinese demographer as saying that "Now [the government is] just talking about launching this, but the specific policies have to be developed at the operational level.") Prudently, the Justice Department has filed no post-argument submission suggesting that the new policy should affect our consideration of the petitioner's appeal.

The Board's opinion, and to a lesser extent that of the immigration judge, are flawed. But the inadequacy of the brief that her lawyer has filed in this court precludes our vacating the denial of asylum. The brief consists almost entirely of verbatim quotations either from the administrative record or from previous decisions of this court. The statement of facts consists almost entirely of quotations from the record, and the summary of argument consists entirely (not "almost entirely") of an extended quotation from one of our previous decisions. The argument section of the brief consists of nothing but quotations from the record and from previous decisions, until the last few pages, which deal with the plaintiff's alternative (and clearly meritless) claim for relief—withholding of removal. Most of the material in that section as well is quoted rather than original material, but there is a bit of interstitial material that appears to be original—though none elsewhere in the brief, excluding the table of contents and other purely formal matter. All in all, in a 49-page brief, if one excludes purely formal matter, there are only five original sentences. A brief so composed is not helpful to either the reviewing court or the client.

An inadequate brief often signals a desperately weak case. This is not a desperately weak case, but we cannot write a party's brief, pronounce ourselves convinced by it, and so rule in the party's favor. That's not how an adversarial system of adjudication works. Unlike the inquisitorial systems of Continental Europe, Japan, and elsewhere, our system is heavily dependent on the parties' lawyers for evidence, research, and analysis. See Stephen McG. Bundy & Einer R. Elhauge, "Do Lawyers Improve the Adversary System? A General Theory of Litigation Advice and Its Regulation," 79 *Cal. L. Rev.* 313, 315–19 (1991); cf. John Thibaut, Lau-

rens Walker & E. Allan Lind, "Adversary Presentation and Bias in Legal Decisionmaking," 86 *Harv. L. Rev.* 386, 386–90 (1972). American judges' dependence on lawyers is suggested by the fact that the ratio of lawyers to judges is 6.29 times higher in the United States than in the principal Continental European judiciaries. Calculated from European Commission for the Efficiency of Justice, *Evaluation Report on European Judicial Systems*, p. 144 tab. 7.1, p. 308 tab. 12.1 (2012), www.coe.int/t/dghl/cooperation/cepej/evaluation/ 2012/Rapport_en.pdf; American Bar Association, *Lawyer Demographics* (2011), www.americanbar.org/content/dam/ aba/migrated/marketresearch/PublicDocuments/lawyer_ demographics_2011.authcheckdam.pdf; *The American Bench: Judges of the Nation* (Jenny Kimball et al. eds., 22d ed. 2012). We're neither authorized nor equipped to write a lawyer's brief for him.

The inadequacy of the brief in this case is especially unfortunate because the Board's opinion and that of the immigration judge contain errors that have led to reversals of the Board in previous cases, though there are also, as we'll see, critical gaps in the petitioner's evidence.

The Board placed great weight on the fact that the petitioner may be able to avoid being forcibly sterilized upon returning to Fujian with her two children simply by not registering the children with the government as permanent residents of China. The Board pointed out that parents of children born abroad can, when they return to China, choose to either register their children and thus "obtain free public education and other benefits [for the children] or opt not to register their children, send them to private school, and pay more for similar benefits [including health care]." An unreg-

istered child is (probably—little about Chinese law is certain, because China does not have the "rule of law" as understood in our legal system) not counted against the number of children (one, with immaterial exceptions) allowed by Chinese law. But unregistered persons appear to be virtual outlaws, and most Chinese families can afford neither private school nor private doctors. Congressional-Executive Commission on China, *China's Household Registration System: Sustained Reform Needed to Protect China's Rural Migrants* 7–10 (2005); U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2012: China* 61. The government's brief candidly acknowledges the "severe consequences" of nonregistration.

The Board went on to say that even if the petitioner were found to have violated the one-child policy (that is, if she rejected the option of not registering her children), State Department and other country reports indicate that forced sterilizations have become so rare in Fujian Province that she had not "demonstrated a reasonable possibility that she would be forcibly sterilized if she returns to China." But the Board in saying such things was cherry-picking among country reports (and within a 2007 State Department report) and other public documents, as in *Qiu Yun Chen v. Holder*, *supra*, 715 F.3d at 209–10. And it was ignoring evidence from other sources, including a Fujian government website that states that sterilization is mandatory for violators of the one-child policy. *Id*. at 212; "Replies to Robert Lin," http://fjjsw.gov.cn:8080/html/5/383/9626_200856322.html (English translation at www.microsofttranslator.com/ bv.aspx?ref=IE8Activity&from=&to=en&a=http%3a%2f%2ffjj sw.gov.cn%3a8080%2fhtml%2f5%2f383%2f9626_200856322.h tml) (".gov.cn" is the Chinese Government's official web

portal). The Board also applied the standard for authentication of documentary evidence that we rejected in *Qiu Yun Chen v. Holder* as too restrictive. 715 F.3d at 211.

The alternative to forced sterilization, the Board thought, might be a fine. But the Board ruled that even if the petitioner were fined 10 times her annual disposable income, she had not proved that imposition of such a fine would amount to persecution because "before she bought the restaurant she now owns, she made enough to send a few hundred dollars to China monthly." That restaurant, which she owns jointly with her husband, is in Appleton, Wisconsin. There is no reason to think that she could earn a comparable income in China; and if not, she could not pay the fine. (But it remains to consider whether her husband might be able to pay it—read on.)

The petitioner's lawyer could have found some live ammunition in the immigration judge's opinion, no part of which the Board questioned. It states that the petitioner's "testimony at her hearings was candid, internally consistent, and consistent with her asylum application and supporting documents. Moreover, many of the facts to which [she] testified and about which she had personal knowledge are corroborated by reliable supporting documents in the record. At her individual hearings, the Government did not attempt to impeach her credibility. The Court therefore finds the [petitioner's] testimony credible."

The petitioner testified that before coming to the United States in 2002 she had worked in a factory in which she earned 300 to 400 yuan a month. In 2002 this was a little more than $48 ($580 a year) at the official exchange rate of 8.277 yuan to a dollar. See Board of Governors of Federal Re-

serve System, "Historical Rates for the Chinese Yuan Renminbi," www.federalreserve.gov/releases/h10/hist/dat00_ch.htm. The immigration judge also accepted the petitioner's estimate of 30,000 yuan as the fine she'd have to pay for violating the one-child policy. At the official exchange rate of 6.663 yuan per dollar in December 2012 (when the immigration judge rejected the asylum application), that is $4,502.

The immigration judge noted that the petitioner and her husband had invested $80,000 to buy their restaurant in Wisconsin, but that "otherwise, she has few assets, and her restaurant has not yet been very profitable." So far as appears, the bulk of the $80,000 was borrowed. She acknowledged earning more than $1,000 a month in 2009 (the year before she testified before the immigration judge). That isn't a great deal, but there is no evidence of what her husband's earnings are. That is one yawning gap in the record; another is the absence of any evidence concerning the husband's earning potential in China. These are serious gaps, attributable to the petitioner.

Refreshingly, after listing the "voluminous country conditions evidence regarding family planning policies in China" and noting their lack of consistency, the immigration judge said of these materials that "taken together … they depict China as a country with serious human rights problems and a strict family planning policy that severely restricts the number of children couples are allowed to have." He went on to say that China's human rights record is "poor" in a number of respects, including a "coercive birth limitation policy"; "local officials are under intense pressure to achieve family planning goals; physical coercion is some-

times reported. These findings are echoed throughout the record in submissions by both the Government and the [petitioner]. … Enforcement and application of the family planning policy are uneven and vary widely from region to region. … [M]edia sources, and hundreds of asylum claimants have described forcible and coercive sterilizations and abortions. In fact, Chinese government officials concede that overzealous officials may have perpetrated such acts."

Yet the immigration judge's opinion states that although documents "from committees in [the petitioner's] and her husband's village and town also suggest that she could be sterilized if she returned to China," the documents "do not indicate that [she] would be forcibly sterilized; they only state that she 'must' be sterilized." But doesn't "must" imply "would"? We're also perplexed by the immigration judge's having given little (actually it seems zero) weight, on the ground of bias, to documents in which neighbors and friends of the petitioner reported forced sterilizations, yet giving no greater weight to similar documents submitted by strangers in other cases, on the ground that those were—other cases. We criticized this heads I win, tails you lose approach to evidence in our opinion in the earlier *Chen* case. See 715 F.3d at 212. And even if the immigration judge could ignore the documents, he could not, consistent with his determination that the petitioner's testimony was credible, ignore as he did her testimony that a sister-in-law, cousin-in-law, several aunts, and her mother-in-law all were sterilized because they'd violated the one-child policy.

The immigration judge concluded (as did the Board when it reviewed his decision) that the petitioner could avoid persecution simply by not registering her children. Yet

that could result in great hardship unless she is wealthy. The immigration judge said she'd "presented no evidence to demonstrate that the higher expenses incurred by forgoing the benefits obtained by registering in the household registration system would cause such 'severe economic damage' that it would amount to persecution." But depending on how great the expense of educating and providing health care for two unregistered children is, registration may be no less costly than the $4,502 fine that she may not be able to pay. It seems questionable to require her to calculate these expense items rather than for the judge to derive them from credible studies. If she can't get better work than as a factory hand, it's hard to see how she can afford to provide private education and private health care for her children.

If she neither forgoes registering her children nor pays a fine (what is called a "social compensation fee"), she risks forcible sterilization. Yet even if she either forgoes registering her children or pays the fine, some risk of forcible sterilization would remain, since Fujian Province appears to have an independent family planning policy stricter than the national policy. See *Qiu Yun Chen v. Holder*, *supra*, 715 F.3d at 209; *Ji Cheng Ni v. Holder*, 715 F.3d 620, 626 (7th Cir. 2013); U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *Country Reports on Human Rights Practices for 2012: China* 58; Congressional-Executive Commission on China, *Annual Report* 90–91 (2012) and *2013 Annual Report* 92 (quoted below). But presumably the Board's conclusion that if the petitioner either doesn't register her children or pays the social compensation fee the risk of forcible sterilization by the Fujian authorities would not rise to a level that would entitle her to asylum would withstand judicial review. See *Huang v. Mukasey*, 534 F.3d 618, 620–21 (7th Cir. 2008). The

crucial question therefore is whether she can afford either the fine, or the costs that failure to register her children would entail. Those costs seem very high, as we've said, but she made no attempt to quantify them. As to whether she can afford to pay the fine instead, the immigration judge pointed out that she had "provided very little evidence regarding her personal financial situation." He also noted that "she paid a large amount of money to smugglers to get to the United States" and that "the most exorbitant fine described in the record [$6,800] … is less than 10% of the [petitioner's] investment in her restaurant"—a meaningless observation, if indeed the money to buy the restaurant was borrowed and she will return to a factory job if she is deported to China. But she presented no evidence of how much she and her husband (or other members of her family) paid the smugglers. Maybe there is family wealth, although her having been a factory worker in China suggests otherwise.

Also missing from the record is evidence of the husband's earning potential in China. But the record does contain an affidavit signed by him (though ignored by the parties and the Board) in which he states that "we will … be fined for a huge amount of money because we have violated the [Fujian] Family Planning Policy. … *Although we might be able to pay the fines*, but we are not willing to because we think we have the right to give births" (emphasis added). This could be regarded as a fatal concession.

We continue to be distressed, however, by the Board's seeming failure to consider the annual reports of the Congressional-Executive Commission on China, a responsible federal agency, where we read for example that "at least 18

of China's 31 provincial-level jurisdictions permit officials to take steps to ensure that birth quotas are not exceeded; in practice, these steps can include forced abortion and forced sterilization." Congressional-Executive Commission on China, *2009 Annual Report* 153, 371 n. 24, citing the State Department's 2008 Human Rights Report on China. And evidently the situation has worsened (though the new policy announcement, discussed at the beginning of this opinion, may herald amelioration): "provincial-level population planning regulations in at least 22 of China's 31 provincial-level jurisdictions explicitly endorse the practice [forced abortion], often referred to as a 'remedial measure' (*bujiu cuoshi*), as an official policy instrument." Congressional-Executive Commission on China, *2013 Annual Report* 100, 226 n. 36. And in the Commissioner's 2009 report we read that a township in Fujian Province advised its officials "to 'strictly act on the demand to carry out [sterilization] within one month' for women who give birth to a second or third child." Congressional-Executive Commission on China, *2009 Annual Report* 155. Fujian is reported to have adopted an elaborate system of rewards and penalties for officials who do and do not fulfill forced-abortion and forced–sterilization targets. *Id*. at 156. Finally,

> between October 2012 and July 2013, the Commission noted reports from at least eight provinces (Hubei, Guangdong, Anhui, Shandong, Henan, Guizhou, Hunan, and Fujian) using phrases such as "spare no efforts" (*quanli yifu* or *fenli*), "use all means necessary" (*qian fang bai ji*), "implement 'man-on-man' military tactics" (*shixing "rendingren" zhanshu*), "fight the family planning battle" (*dahao jisheng gongjianzhan*), and "assault and storm the fortifications" (*tuji gongjian*) to urge officials to implement family

planning measures. The implementation measures pro-moted in these reports were harsh and invasive, including "remedial measures," the "two inspections" (intrauterine device (IUD) inspections and pregnancy inspections), the "four procedures" (IUD implants, first-trimester abortions, mid- to late-term abortions, and sterilization), and the col-lection of "social maintenance fees."

Congressional-Executive Commission on China, *2013 Annual Report* 100 (footnotes omitted).

Still, both the immigration judge's opinion and the Board's opinion are improvements on what we faced in the *Qiu Yun Chen* case that we've been citing. And the govern-ment's brief is refreshingly candid in acknowledging defi-ciencies in the agency's analysis of China's one-child policy. But the petitioner's failure to present evidence concerning her and her husband's financial situation is a fatal weakness in her case.

The petition to review the Board's denial of asylum is

DENIED.