[Cite as *Buffenbarger v. Estate of Meyer*, 2023-Ohio-2760.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

ROBERT THOMAS BUFFENBARGER,
ET AL.,                                                    :

                                    Plaintiffs-Appellants,   :   Case No.  22CA10

                    v.                                      :
                                                 NUNC PRO TUNC
ESTATE OF WILLIAM AUGUSTUS          :   DECISION & JUDGMENT ENTRY
 MEYER, ET AL.,
                                                            :
                                    Defendants-Appellees.

_____

APPEARANCES:

Donald A. Cox, Orient, Ohio, for appellants.

Joshua Gunsher and Michael P. Richardson, Fairfield, Ohio, for
appellees.

_____
CIVIL APPEAL FROM PROBATE COURT
DATE JOURNALIZED:7-26-23
ABELE, J.

{¶1} This is an appeal from a Highland County Common Pleas

Court, Probate Division, summary judgment in favor of Kurt A.

Buffenbarger (Kurt) and James T. Buffenbarger (Tad)[1] as

coexecutors of the estate of William Augustus Meyer, defendants

---

The depositions sometimes refer to James T. Buffenbarger
as Thad.  Throughout this opinion, we have chosen the nickname
that appears in appellees' brief, Tad.

HIGHLAND, 22CA10

below and appellees herein.

Robert Thomas Buffenbarger (Tom), Bruce Timothy Buffenbarger (Tim), and additional parties,[2] plaintiffs below and appellants herein, assign the following error for review:

> "DID THE TRIAL COURT CORRECTLY GRANT THE SUMMARY JUDGMENT IN THE COURT BELOW BASED UPON THE PROPER STANDARD OF REVIEW SET FORTH IN OHIO CIVIL RULE 56?"

{¶3} William Augustus Meyer, the decedent, was an elderly man who never married or had children. Two of the decedent's nephews who lived in the area, Kurt and Tad, along with Tad's wife, Carla Buffenbarger, helped care for him until his death on November 8, 2020.

{¶4} On March 11, 2021, the decedent's last will and testament was filed in probate court. The will bequeathed various amounts of money to some of the decedent's relatives and to charitable organizations. Each of the following nieces and nephews received $5,000: Linda Meyer, Vicky Meyer, Kurt Warner, Timothy Buffenbarger, Sally Sagel, and Tom Buffenbarger. Another niece, Tisha Golden, received $20,000. The will left the primary residence to Kurt and the residual estate to Kurt and Tad. The will also appointed Kurt and Tad as the estate's

---

[2] The additional plaintiffs listed in the complaint are Vicki Anne Gierhart, Linda Meyer, Sara Jane Sagel, Kathy Dye Edwards, and William Rawers.

personal representatives.  Additionally, the will recites that the decedent signed the document on October 31, 2020, before two disinterested witnesses, contains a "certificate of acknowledgment" to indicate that on October 31, 2020 the decedent acknowledged the will before Michelle Nephew, a notary, and each page of the will contains the decedent's signature.

{¶5}  On May 4, 2021, appellants filed a will-contest complaint and alleged they are estate beneficiaries and the will admitted to probate is invalid.  Appellants claimed, inter alia, that the decedent lacked testamentary capacity, the will was not properly witnessed, the "will is the product of undue influence, manipulation, deceit, and coercion," and the "will is a fraud and a fake."

{¶6}  On July 22, 2022, appellees filed a summary judgment motion and asserted that appellants have no evidence to create a genuine issue of material fact as to validity of the will.  In response, appellants argued that genuine issues of material fact remain because of witness credibility, the decedent's testamentary capacity, whether the will had been properly witnessed and whether Kurt unduly influenced the decedent.  To support their argument, appellants relied upon the depositions that had been filed in the case.

{¶7} In reply, appellees asserted that appellants did not produce competent evidence to show that genuine issues of material fact remain for a factfinder to resolve. In particular, they pointed out that because none of the appellants have personal knowledge of the circumstances that surrounded the preparation and execution of the will, they are not competent to testify to the decedent's testamentary capacity, to the will's execution, or whether the will is the product of undue influence.

{¶8} A review of the depositions reveal that, before the decedent's death, Kurt explained he had some discussions with him about a will. The decedent was familiar with radio-talk-show host Dave Ramsey and "his will kit." Kurt told the decedent that "he needed something like that." Kurt also found what appeared to be a handwritten will worksheet in the decedent's house and brought it to the decedent, who at that point resided in a medical facility. Kurt asked the decedent if the worksheet contained the provisions the decedent wanted to include in his will, and he confirmed that it did. Kurt then used the will worksheet to prepare the will the decedent signed.

{¶9} Kurt took the will to the decedent in the hospital and he read the will. Kurt then left the room before the decedent

HIGHLAND, 22CA10

signed the will.  Approximately ten minutes later, Kurt returned to the room and picked up the signed will.

**{¶10}** Tamson Connelly, a registered nurse, witnessed the decedent sign the will.  She stated that the other witness, Candace Schnee, also was present in the room.  Connelly thinks that a notary also may have been in the room, but she does not specifically recall whether a notary actually was present.  Connelly did not remember precisely how long she was in the room, the time of day she witnessed the signature, or anything specific about the decedent.  Also, Connelly does not know if the decedent read the will.  She explained, however, that she has witnessed wills in the past and when she does so, she ensures that the person is the "right patient" by asking for the person's name and checking the person's arm band.  As part of her process, Connelly would ask the person if he or she was aware that she had been asked to witness their signature and she "would stand there and watch him sign his name before I would sign my name that I saw him sign his name to the document." Connelly stated that, if she saw anything that led her to believe that the person was being pressured, she would say something.

{¶11} Candace Schnee, a nurse practitioner, also witnessed the decedent sign the will.  Schnee stated that she, Connelly and a notary were all present in the room when the decedent signed the will, but she does not recall specific people in the room.  Schnee indicated that the decedent was in the bed and the will may have been on a bedside table or a clipboard, but she does not recall.  She also does not know if the decedent read the will.  Schnee stated that she had not witnessed a will signature in the past, but she had witnessed other legal documents.  She explained that, before she would sign a document as a witness, she would assess the room and the patient to "read everything going on in the room" and would engage in conversation to ensure that the person understood "where they are, who they are."  Schnee stated that she would not sign a document if she felt that something was not right, or if she thought that the person signing did not know what the person was doing.

{¶12} Linda Jane Meyer testified that she was surprised to learn that the decedent had a will because two of the decedent's sisters told her over the years that the decedent "will never write a will, or he will leave it all to the church if he did."  Meyer was not surprised, however, that the decedent left the majority of the estate to Kurt and Tad, because "they were the

ones [who] were looking after him." Meyer did not have personal knowledge regarding the decedent's medical condition in the year preceding his death, except what she heard from Kurt. Meyer also did not have any personal knowledge surrounding the decedent's execution of the will.

**{¶13}** Sara Jane Sagel testified that she did not believe that the will admitted to probate is "legitimate." She admitted, however, that she was not present when the decedent executed the will and had no personal knowledge of the circumstances that surrounded the will's execution. Sagel stated that she obtained some information about the decedent and his medical condition from Tad or Carla Buffenbarger. Sagel believes that the will is invalid due to some "red flags." She did not think that an attorney drafted the will, and the will contained language "to bypass Probate and to offer an asset inventory to the beneficiaries," and the will provided for "no accounting of the Estate." She also found it odd that one of her cousins is not listed in the will, "as if she had already passed," but the cousin's two children are included. Sagel additionally thought that the decedent's signature appeared "weak" whereas his initials "seemed to have a lot of strength." She also questioned why the addresses for the will's witnesses

appeared to have been written by the same person and why the witnesses did not complete the information on their own.

**{¶14}** Mary Kathleen Edwards stated that she found the will suspicious because it bequeathed money to one of her aunt's children, but not to the aunt alive at the time the decedent signed the will. She did not believe that the decedent would have left the aunt out of his will.

**{¶15}** Tim testified that Kurt texted him after the decedent passed and informed Tim that the decedent looked over the will "very carefully and signed his initials on each page as the witnesses looked on." However, Tim has no personal knowledge of the circumstances that surrounded the decedent's signing of the will and only knew "what Kurt told [him]." Tim also has a picture of the decedent, dated October 31, 2020, the date the decedent signed the will. Tim believes that the photo shows the decedent "to be in very ill health" and "as if his mind is not very cognitive." Tim agreed, however, that he is not a nurse, doctor, or other medical professional, and has no firsthand knowledge of the decedent's medical diagnoses. Tim stated, however, that he "knew he was in bad shape." Tim believes that the will is invalid for the following reasons: (1) one cousin "who was alive at the time was not listed as a beneficiary, but yet her children were," and this cousin's absence from the will

is "very suspicious," (2) some cousins were not included while some were, (3) the will stated "there would be no inventory of assets," which he thought suspicious, and (4) "the massive discrepancy" in the amount left to some of the relatives compared to Kurt and Tad. Tim did not think the decedent was the type of person who would have a large disparity in the disposition of his assets.

{¶16} Tim also stated that he did not think that the decedent had a will because either Kurt or Tad told him, at some point in the past, that the decedent had "a folder with stuff in it that would tell how to take care of things." Although Tim agreed that Kurt or Tad found the folder that contained the handwritten will worksheet that Kurt used to prepare a computerized print-out of the decedent's will, Tim questioned whether the decedent had actually prepared the worksheet. He pointed out that the writing is in pencil and then someone used a pen to trace over the pencil. Tim also questioned why the decedent did not include "Madeline and Kathy," but included "Tish and Kurt Warner." He explained that Madeline was Tish and Kurt's mother and that bequeathing money to Tish and Kurt, but not to their mother, made "no sense." In Tim's opinion, "the Will is fraudulent." He based his opinion upon "Kurt's previous

actions regarding a previous uncle's Estate and also the way in which this Will came out of nowhere." He thought that the estate assets should have been mostly equally divided among the number of living relatives with a little extra for Kurt and Tad. Tim also thinks the will is fraudulent because "some of the signatures are not [the decedent's] signatures" and "[the decedent's] initials were not put there by [the decedent]." "The signatures, the way it was witnessed, the fact that Kurt drew it up, and the beneficiary list" all seem suspicious to him. Tim believes that Kurt made the will and the decedent did not read it thoroughly before he signed it.

{¶17} Tim also is not certain that the witnesses actually watched the decedent read the will and sign it as he read it. He thinks that the witnesses should have watched the decedent write his signature on each page, but does not believe the witnesses did so "because they're hospital staff and that would be time consuming, and I don't know that they could be away from their job that long to do it." Tim agreed, however, that he is "making some assumptions to get to [his] conclusion." Furthermore, Tim does not think that the two nurses who witnessed the decedent sign the will were "given all the instructions required to make it valid, in that they were supposed to see that he seemed of sound mind and that they

HIGHLAND, 22CA10

watched him read it and signature each page, initial it." Tim

summed up his theory about the will's validity as follows:

> [The decedent's] physical condition deteriorated to the point where Kurt, possibly Carla, saw that he wasn't going to last very much longer, and not having had a Will written, Kurt decided to get on the computer and generate one, and put it – and put it to his liking, and he then went to [the decedent], and I don't know how he presented it to him.
> And then it was – the pages were signed and he signed the final page. And I believe there was – because Kurt is the Executor, made himself Executor, you know, I think he – that he then made it very favorable to him on the distribution of the Estate.
> I believe he either forged signatures in the past to become the [power of attorney] of his accounts, and I believe his actions regarding our [previous uncle's] Estate showed deception and dishonesty.[3]

**{¶18}** Tom Buffenbarger believes that the decedent's overall

medical issues "would have had an impact on his ability to

understand what he was doing with" the will. Carla told Tom

that the decedent "was not able or knowledgeable about signing

his own health care documents, such as admittance to a

hospital." Tad also told him that the decedent "was in bad

shape." Tom explained his concerns about the will:

> The names listed, the amounts, the omissions and knowledge from many, many years ago, [the decedent] stated on several occasions that when he died, we would

---

[3] The deposition testimony does not shed much light on Kurt's previous actions regarding a different uncle's estate, except that Kurt was named the executor of this other uncle's estate.

– everything would go to whoever was left of us, the nieces and nephews.

    He had no wife, no children, no other close relatives, you know, family relatives left. In addition, seeing that Thad [sic] and Kurt were named as the Executors, the concern was Kurt.

{¶19} Tom recalled that the last time he heard the decedent state that he wanted to distribute his estate to his nieces and nephews was at least ten years earlier. Tom also claimed that the decedent had said that he had binders stored with "everybody's name" on them that "represented [the decedent's] last wishes." However, he never saw these purported binders.

{¶20} On October 13, 2022, the trial court entered summary judgment in appellees' favor and dismissed the will-contest complaint. The court determined that appellants failed to establish genuine issues of material fact as to whether the decedent lacked testamentary capacity, whether the decedent had been unduly influenced, and whether the will had been properly witnessed. This appeal followed.

I.

{¶21} In their sole assignment of error, appellants assert that the trial court erred by entering summary judgment in appellees' favor.[4] Appellants claim that the facts "are subject

---

[4] We observe that appellants' brief does not contain a table of contents, a table of cases, or a statement of the case or citations to authority that support the primary assertions made

HIGHLAND, 22CA10

to many different interpretations and give rise to many issues of credibility and inferences that can be drawn from the conduct of the parties."

A.

---

(although it does cite to authority in support of the summary-judgment standard).  See App.R. 16(A)(1), (2), and (5).  Under App.R. 16(A)(7), an appellant's brief shall include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."  Moreover, appellate courts should not perform independent research to create a litigant's argument. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 19, quoting *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 78 (O'Donnell, J., concurring in part and dissenting in part), quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) ("'"appellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them"'"); *accord State v. Lykins*, 4th Dist. Adams No. 18CA1079, 2019-Ohio-3316, ¶ 57. "[W]e cannot write a party's brief, pronounce ourselves convinced by it, and so rule in the party's favor.  That's not how an adversarial system of adjudication works."  *Xue Juan Chen v. Holder*, 737 F.3d 1084, 1085 (7th Cir. 2013).  Consequently, although we would be within our discretion to disregard the assignment of error, in the interest of justice we will addresses the arguments that appear to be raised in appellants' brief and as appellees have responded in their appellate brief. *See In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 271, 2011-Ohio-2638, 951 N.E.2d 751, ¶ 14; *Robinette v. Bryant*, 4th Dist. Lawrence No. 14CA28, 2015-Ohio-119, ¶ 33 (within court's discretion to disregard any assignment of error that fails to present case citations cases or statutes in support.

{¶22} Appellate courts conduct a de-novo review of trial-court summary-judgment decisions. *E.g., State ex rel. Novak, L.L.P. v. Ambrose*, 156 Ohio St.3d 425, 2019-Ohio-1329, 128 N.E.3d 209, ¶ 8; *Pelletier v. Campbell*, 153 Ohio St.3d 611, 2018-Ohio-2121, 109 N.E.3d 1210, ¶ 13; *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Accordingly, an appellate court need not defer to a trial court's decision, but instead must independently review the record to determine if summary judgment is appropriate. *Grafton*, 77 Ohio St.3d at 105.

{¶23} Civ.R. 56(C) provides in relevant part:

> * * * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶24} Therefore, pursuant to Civ.R. 56, a trial court may not award summary judgment unless the evidence demonstrates that: (1) no genuine issue as to any material fact remains to be

litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) after viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party. *E.g., State ex rel. Whittaker v. Lucas Cty. Prosecutor's Office*, 164 Ohio St.3d 151, 2021-Ohio-1241, 172 N.E.3d 143, ¶ 8; *Pelletier* at ¶ 13; *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

**{¶25}** Under Civ.R. 56, the moving party bears the initial burden to inform the trial court of the basis for the motion and to identify those portions of the record that demonstrate the absence of a material fact. *E.g., Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). The moving party cannot discharge its initial burden with a conclusory assertion that the nonmoving party has no evidence to prove its case. *E.g., Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 147, 677 N.E.2d 308 (1997); *Dresher, supra*. Rather, the moving party must specifically refer to the "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any," which affirmatively demonstrate that the

nonmoving party has no evidence to support the nonmoving party's claims. Civ.R. 56(C); *Dresher, supra.*

> [U]nless a movant meets its initial burden of establishing that the nonmovant has either a complete lack of evidence or has an insufficient showing of evidence to establish the existence of an essential element of its case upon which the nonmovant will have the burden of proof at trial, a trial court shall not grant a summary judgment.

*Pennsylvania Lumbermens Ins. Corp. v. Landmark Elec., Inc.*, 110 Ohio App.3d 732, 742, 675 N.E.2d 65 (2nd Dist.1996). Once the moving party satisfies its burden, the nonmoving party bears a corresponding duty to set forth specific facts to show that a genuine issue exists. Civ.R. 56(E); *Dresher, supra.* More specifically, Civ.R. 56(E) states:

> * * * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party.

**{¶26}** Additionally, when trial courts consider summary-judgment motions, Civ.R. 56(C) specifies that the court may examine only "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, [that are] timely filed in the action." *See also Whitt v. Wolfinger*, 2015-

Ohio-2726, 39 N.E.3d 809, 813-14, ¶ 12 (4th Dist.); *Davis v. Eachus*, 4th Dist. Pike No. 04CA725, 2004-Ohio-5720, ¶ 36; *Wall v. Firelands Radiology, Inc.*, 106 Ohio App.3d 313, 334, 666 N.E.2d 235 (6th Dist.1995).  Furthermore, a trial court generally may consider only evidence that would be admissible at trial.  *Lowe v. Cox Paving, Inc.*, 190 Ohio App.3d 154, 2010-Ohio-3816, 941 N.E.2d 88, ¶ 27 (12th Dist.), citing *Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 631, fn. 4, 605 N.E.2d 936 (1992) ("Only facts which would be admissible in evidence can be * * * relied upon by the trial court when ruling upon a motion for summary judgment"). "Deposition testimony, in particular, must be admissible under the rules of evidence" and "must be based on personal knowledge."  *Turnmire v. Turnmire*, 2022-Ohio-3968, 200 N.E.3d 604, ¶ 24 (12th Dist.) (citations omitted).

{¶27} Evid.R. 602 provides, in part, that a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  "'Personal knowledge' is '[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said.'"  *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 320, 2002-Ohio-

2220, 767 N.E.2d 707, ¶ 26, quoting Black's Law Dictionary (7th Ed.Rev.1999) 875, and citing Weissenberger's Ohio Evidence 213, Section 602.1 (2002) ("The subject of a witness's testimony must have been perceived through one or more of the senses of the witness. * * * [A] witness is 'incompetent' to testify to any fact unless he or she possesses firsthand knowledge of that fact."); *accord* 1 McCormick on Evidence 40, Section 10 (5th Ed.1992) ("[a] person who has no knowledge of a fact except what another has told him does not, of course, satisfy the requirement of knowledge from observation."). Thus, "[e]vidence is inadmissible under Evid.R. 602 if the witness could not have actually perceived or observed what [the witness] is testifying about." *Turnmire* at ¶ 27, citing *M. B. A. F. B. Fed. Credit Union v. Cumis Ins. Soc., Inc.*, 681 F.2d 930, 932 (4th Cir. 1982), citing 2 Wigmore, Evidence, Section 658 (Chadbourn Rev. 1979), and 3 Weinstein & Berger, Weinstein's Evidence, Section 602(02) (1981). Consequently, "'[m]ere speculation and unsupported conclusory assertions are not sufficient'" to meet the nonmovant's reciprocal burden to set forth specific facts to show that a genuine issue exists. *Bank of New York Mellon v. Bobo*, 2015-Ohio-4601, 50 N.E.3d 229, ¶ 13 (4th Dist.), quoting *Loveday v. Essential Heating Cooling & Refrig., Inc.*, 4th Dist. Gallia No. 08CA4, 2008-Ohio-4756, ¶ 9.

HIGHLAND, 22CA10

{¶28} We additionally observe that not every factual dispute precludes summary judgment.  Rather, only disputes as to the material facts preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  "As to materiality, the substantive law will identify which facts are material." *Id.* at 248; *accord Turner v. Turner*, 67 Ohio St.3d 337, 340, 617 N.E.2d 1123 (1993).

{¶29} Moreover, any disputed material facts must present genuine issues, meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986).  For this reason, the summary-judgment evidence must reveal more than "some metaphysical doubt as to the material facts."  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted).  Accordingly, if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

{¶30} In the case at bar, as we explain below, even if some disputed facts exist, none are material facts that raise genuine issues that would preclude summary judgment.

B.

{¶31} We initially note that in a will-contest action, an order that admits a will to probate "is prima-facie evidence of the attestation, execution, and validity of the will." R.C. 2107.74. Thus, a will admitted to probate is rebuttably presumed to be valid. *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 64, 567 N.E.2d 1291 (1991). When a rebuttable presumption arises, "a party challenging the presumed fact must produce evidence of a nature that counterbalances the presumption or leaves the case in equipoise. Only upon the production of sufficient rebutting evidence does the presumption disappear." *Myocare Nursing Home, Inc. v. Fifth Third Bank*, 98 Ohio St.3d 545, 2003-Ohio-2287, 787 N.E.2d 1217, ¶ 35. Once the presumption of a will's validity arises, the burden of proof shifts to the will contestants to prove, by a preponderance of the evidence, that the will is invalid. *Stanek v. Stanek*, 2nd Dist. Greene No. 2018-CA-39, 2019-Ohio-2841, ¶ 35, citing *Bustinduy v. Bustinduy*, 2d Dist. Champaign No. 98-CA-21, 1998 WL

HIGHLAND, 22CA10

879121, *2 (Dec. 18, 1998), citing *Golding v. Ohio Natl. Bank of Columbus*, 115 Ohio App. 465, 466, 185 N.E.2d 577, (10th Dist.1962).

{¶32} In the case sub judice, the trial court admitted the will to probate.  Therefore, the will enjoys a presumption of validity and the burden falls upon appellants to produce evidence to demonstrate that genuine issues of material fact remain regarding the will's validity.  Appellants appear to assert that genuine issues of material fact remain as to whether (1) the will was properly witnessed, (2) the decedent had testamentary capacity, and (3) the will was the product of undue influence.

1

{¶33} R.C. 2107.03 sets forth the requirements for the execution of a will.  A will must be in writing and "signed at the end by the testator or by some other person in the testator's conscious presence and at the testator's express direction."  R.C. 2107.03. Additionally, "[t]he will shall be attested and subscribed in the conscious presence of the testator, by two or more competent witnesses, who saw the testator subscribe, or heard the testator acknowledge the testator's signature."  R.C. 2107.03. "'[C]onscious presence'

means within the range of any of the testator's senses, excluding the sense of sight or sound that is sensed by telephonic, electronic, or other distant communication." R.C. 2107.03.

**{¶34}** To attest and subscribe involves "two acts: (1) an 'act of the senses' by personally observing the signing or acknowledgment of signature by the testator and (2) a physical act of signing the document, under the observation of the testator, to prove that the attestation occurred." *In re Estate of Shaffer*, 163 Ohio St.3d 497, 2020-Ohio-6973, 171 N.E.3d 281, ¶ 17, citing *Tims v. Tims*, 22 Ohio C.D. 506, 14 Ohio C.C.(N.S.) 273 (1911), quoting Schouler, A Treatise on the Law of Wills, Section 330 (2d Ed.1892). A competent witness within the meaning of R.C. 2107.03 is a witness who "satisfies the elements of R.C. 2317.01." *Shaffer* at ¶ 16, citing *Rogers v. Helmes*, 69 Ohio St.2d 323, 432 N.E.2d 186 (1982), paragraph one of the syllabus. R.C. 2317.01 provides:

> All persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly.

**{¶35}** In the case at bar, the will contains the decedent's signature and the signatures of two witnesses, nurses at the medical-care facility where the decedent was hospitalized.

Appellants did not put forth any evidence to suggest that the nurses are not competent witnesses. None of the evidence suggests they were of unsound mind or under ten years of age. Furthermore, both nurses stated in their depositions that, even though they could not recall the precise details that surrounded the execution of the will, they did recognize that they signed the will. They explained their normal procedure and observation when they witness a patient sign a legal document and the nurses said they would have followed this usual procedure when they witnessed the decedent sign the will. Moreover, their usual procedure indicates they would not have signed as witnesses if they were not within the decedent's conscious presence. Consequently, the evidentiary materials submitted to the court demonstrate that the nurses are competent witnesses and that they attested and subscribed the will in the decedent's conscious presence.

**{¶36}** Appellants argue that a genuine issue of material fact exists and point out that the nurses thought that a notary had been present at the time that they signed the will and that this mystery notary somehow establishes a genuine issue of material fact regarding the execution of the will. We do not agree. The presence or absence of a notary does not affect the fact that

(1) the two nurses, according to their usual procedures, would have witnessed the decedent subscribe his name to the will, and (2) they signed the will as witnesses and would not have done so if they had any question regarding the decedent's conscious presence. *See Ayer v. Morenz-Harbinger*, 1st Dist. Hamilton No. C-190687, 2020-Ohio-6861, ¶ 42 (will contestant cannot "create a triable issue based solely on [witness's] lack of memory as to the details of the execution"). Moreover, appellants did not cite any authority to support their assertion.

**{¶37}** We therefore disagree with appellants that genuine issues of material fact remain as to the will's execution.

2

**{¶38}** Appellants also assert that genuine issues of material fact remain regarding the decedent's testamentary capacity. "A person who is eighteen years of age or older, of sound mind and memory, and not under restraint may make a will." R.C. 2107.02. A testator is of sound mind and memory and has testamentary capacity when the testator: (1) understands the nature of the business in which the testator is engaged; (2) comprehends generally the nature and extent of the testator's property; (3) holds in the testator's mind the names and identity of those who have natural claims upon the testator's bounty; and (4) appreciates the testator's relation to the members of the

testator's family. *Niemes v. Niemes*, 97 Ohio St. 145, 119 N.E. 503 (1917), paragraph four of the syllabus. Testamentary capacity ordinarily is determined as of the will-execution date. *Kennedy v. Walcutt*, 118 Ohio St. 442, 161 N.E. 336 (1928), paragraph two of the syllabus, overruled on other grounds, *Kirschbuam v. Dillon*, 58 Ohio St.3d 58, 64, fn. 9, 567 N.E.2d 1291 (1991). "However, evidence of the testator's mental and physical condition, both at the time the will was executed and within a reasonable time before and after its execution, is admissible as casting light on [the testator's] testamentary capacity." *Riley v. Tizzano*, 4th Dist. Washington No. 06CA3, 2006, ¶ 15.

**{¶39}** In the case sub judice, we agree with the trial court's conclusion that appellants did not submit evidence to establish that a genuine issue of material fact exists regarding the decedent's testamentary capacity. None of the appellants had been in contact with the decedent at, or within a reasonable time before or after, he executed the will. In fact, the last time any appellant had been in the decedent's presence was approximately 18 months before his death. Thus, none observed, or had an opportunity to evaluate, the decedent's testamentary capacity at or near the time that he executed the will.

Consequently, appellants lack personal knowledge of the decedent's mental or medical state near the time that he signed the will. Instead, appellants base their claims about the decedent's testamentary capacity upon unsupported conclusions that his poor health rendered him unable to understand what he was doing when he signed the will. The two witnesses to the will, however, stated that, although they could not precisely recall the circumstances that surrounded the execution of the will, they would not have signed as witnesses if they had doubts regarding the decedent's testamentary capacity. Furthermore, although appellants complain that no one explained the will to the decedent, appellants did not cite any authority that requires someone to verbally explain the contents of a will to a decedent in order for the decedent to have testamentary capacity.

{¶40} Additionally, even if the decedent may have been in poor health at the time that he signed the will, poor health does not necessarily equate to a lack of testamentary capacity. Instead, any "[s]uch health decline must have actually affected the testator's capacity to execute the will." *Foelsch v. Farson*, 2020-Ohio-1259, 153 N.E.3d 601, ¶ 33 (5th Dist.); *accord Meek v. Cowman*, 4th Dist. Washington No. 07CA31, 2008-Ohio-1123, ¶ 17 (no evidence existed that decedent lacked testamentary

capacity, even though he had been declared incompetent and on medication for dementia, when no evidence established how the dementia affected the decedent or that dementia rendered him unable to understand what he was doing when he made his will); *In re Estate of Goehring*, 7th Dist. Columbiana Nos. 05 CO 27 & 05 CO 35, 2007-Ohio-1133, ¶ 54 (genuine issue of material fact did not exist even though testator had Alzheimer's disease when testator executed the will; no evidence indicated that disease "actually affected the testator's capacity to execute the will"); *Martin v. Dew*, 10th Dist. Franklin No. 03AP-734, 2004-Ohio-2520, ¶ 20 (no genuine issue of material fact when evidence did not show that "decedent was affected by dementia on the date she executed the will, and the uncontradicted statements by the individuals who witnessed her sign the will indicate she was alert, oriented, and had testamentary capacity"); *Robinson v. Harmon*, 107 Ohio App. 206, 206, 157 N.E.2d 749 (2d Dist.1958) ("Evidence that a person who executed a will was suffering from some of the infirmities of old age, such as failing eyesight, tremor of the hand in writing and a tendency to talk to himself and to change subjects frequently in conversation, does not of itself show a lack of testamentary capacity.").

**{¶41}** In the case before us, the will's admission to probate constitutes prima-facie evidence of its validity, and the two witnesses' deposition testimony demonstrates the absence of a genuine issue of material fact as to whether the decedent's health condition actually affected the decedent's testamentary capacity. Moreover, appellants did not present any admissible summary-judgment evidence to contradict the two witnesses' deposition testimony. Rather, appellants offered unsupported conclusions and speculation.

**{¶42}** Consequently, we conclude that appellants did not establish that a genuine issue of material fact remains as to the decedent's testamentary capacity.

3

**{¶43}** Appellants further contend that the decedent's will is a product of undue influence. A will is invalid if it is the product of undue influence. *Riley v. Tizzano*, 4th Dist. Washington No. 06CA3, 2006-Ohio-6625, ¶ 20, citing *West v. Henry*, 173 Ohio St. 498, 510-511, 184 N.E.2d 200 (1962). "A testator is unduly influenced by another when the testator is restrained from disposing of property in accordance with his own wishes and instead substitutes the desires of another." *Id.* To

establish undue influence in a will-contest action, the will contestant must prove by clear and convincing evidence: "(1) a susceptible testator, (2) another's opportunity to exert [undue influence], (3) the fact of improper influence exerted or attempted and (4) the result showing the effect of such influence." *Redman v. Watch Tower Bible & Tract Soc. of Pennsylvania*, 69 Ohio St.3d 98, 101, 630 N.E.2d 676 (1994), citing *West*, 173 Ohio St. at 510-511.

> "[G]eneral influence, however strong or controlling, is not undue influence unless brought to bear directly upon the act of making the will." *West*, *supra* at 501. Further, "[t]he mere existence of undue influence, or an opportunity to exercise it, although coupled with an interest or motive to do so, is not sufficient, but such influence must be actually exerted on the mind of the testator with respect to the execution of the will in question." *Id.*

*Riley* at ¶ 25.

**{¶44}** Furthermore, a will is not presumed to be the product of undue influence simply because a testator "'disposes of his property in an unnatural manner, unjustly, or unequally, and however much at variance with expressions by the testator concerning relatives or the natural objects of his bounty.'" *West*, 173 Ohio St. at 502, quoting 94 Corpus Juris Secundum, 1074, at Section 224. Instead, an unnatural, unjust, or unequal property disposition – or one that varies from a testator's

previous expressions – "'does not invalidate the will, unless undue influence was actually exercised on the testator.'" *Id.*, quoting 94 Corpus Juris Secundum, 1074, at Section 224.  We additionally note that the relevant time period to evaluate the existence of undue influence "is the time at or near the execution of the will" or at "a reasonable period before and after the execution of the document." *Knowlton v. Schultz*, 179 Ohio App.3d 497, 2008-Ohio-5984, 902 N.E.2d 548, ¶ 22 (1st Dist.).

**{¶45}** In the case sub judice, our review reveals that the record contains no evidence to establish that the will is the product of undue influence, or that anyone actually exerted undue influence on the decedent.  Instead, the will admitted to probate matches a handwritten will that the decedent had prepared.  According to Kurt, before the decedent's death he confirmed that the handwritten will accurately set forth his wishes.  Once again, no evidence exists that anyone exercised undue influence over the decedent that resulted in a will that did not reflect the decedent's wishes.  The will admitted to probate matches the wishes that the decedent had documented in a handwritten will.  Appellants offer no evidence to establish a genuine issue of material fact as to whether the will was the product of undue influence.  Instead, all of their arguments are

based upon speculation and innuendo, not admissible summary-judgment evidence.

**{¶46}** In sum, we believe that appellants have not established the existence of any genuine issues of material fact regarding the validity of the will.  Consequently, the trial court did not err by entering summary judgment in appellees' favor.

**{¶47}** Accordingly, based upon the foregoing reasons, we overrule appellants' sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellees recover of appellants the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Common Pleas Court, Probate Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
                                    Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.