[Cite as *In re Estate of Means v. Means*, 2025-Ohio-2564.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# UNION COUNTY

IN RE:  THE ESTATE OF
JOHNSTON H. MEANS

  -AND-

DANIEL J. MEANS,

    PLAINTIFF-APPELLEE,

  V.

THOMAS F. MEANS, ET AL.,

    DEFENDANTS-APPELLANTS.

CASE NO. 14-24-47

OPINION AND
JUDGMENT ENTRY

Appeal from Union County Common Pleas Court
Probate Division
Trial Court No. 2021PE096

Judgment Affirmed

Date of Decision:  July 21, 2025

APPEARANCES:

    *Todd A. Long* for Appellant

    *Jud R. Mauger & Andrew J. Lichtman* for Appellee

**ZIMMERMAN, J.**

{¶1} Defendants-appellants, Thomas F. Means ("Thomas") and Ann C. Means ("Ann") (collectively, "defendants"), appeal the June 16, 2023 judgment of the Union County Court of Common Pleas, Probate Division, granting summary judgment in favor of plaintiff-appellee, Daniel J. Means ("Daniel"), and the November 26, 2024 judgment settling the estate of Johnston H. Means ("Johnston"). For the reasons that follow, we affirm.

{¶2} This case originates from a dispute between Johnston's sons, Daniel and Thomas, along with Thomas's wife, Ann, following Johnston's death. Daniel, Thomas, and Ann are Johnston's sole heirs in his 2020 will. Daniel, married to Mollie Means ("Mollie"), resides in Seattle, Washington, and they have two adult children; Daniel and Mollie are both employed. Thomas and Ann, a real estate agent, have three adult children, including Andrew Means ("Andrew") who was involved with Johnston's investments at Hamilton Capital Management ("Hamilton Capital"). Thomas is self-employed by the Means Advisory Group, Inc., and co-owns White Water Holdings, LLC, which owns Guaranteed Clean Energy, LLC.

{¶3} Johnston, a retired attorney with expertise in estate, tax, employee, and business organizations law, was a founding partner of Means, Bichimer, Burkholder & Baker Co., L.P.A., and a veteran of the Korean War. Johnston passed away on June 1, 2021 at the age of 93. In his later years, Johnston experienced declining

health due to Parkinson's disease, which caused hand tremors affecting his ability to type and write. He also had significant hearing loss from his military service. After his wife's death in 2014, Johnston lived alone and, after ceasing to drive sometime in 2019, became reliant on Thomas for daily care, transportation, and communication. Thomas also served as Johnston's attorney-in-fact. Johnston was hospitalized following a fall on November 28, 2020, and subsequently moved to a nursing care facility on December 31, 2020, where he remained until his death.

{¶4} The core of the conflict in this case revolves around the validity of Johnston's 2020 will—which notably departed from his long-standing pattern of dividing his estate equally between his sons—along with Thomas's management of Johnston's assets prior to his death. Historically, Johnston's estate plans treated his sons equally: the Means Investment Company ("MIC"), a partnership established in 1980 to manage farmland in Delaware County, initially allocated Johnston 50 percent and each son 25 percent. Johnston's 1998 and 2005 wills and trusts also reflected this equal division, with a 2005 trust amendment providing Daniel an additional $400,000.00 to offset a prior gift to Thomas. Likewise, the investment account opened at Hamilton Capital in 2017 was designated to pass equally to Thomas and Daniel upon Johnston's death.

{¶5} However, in the summer of 2019, Johnston, along with Thomas, engaged attorneys Bruce Burkholder ("Burkholder") and John Lucas ("Lucas") of Isaac Wiles Burkholder & Miller, LLC ("Isaac Wiles") for additional estate

planning. According to the evidence in the record, Johnston's primary concerns included a 2006 security interest held by Heritage Administration Services, Inc. ("Heritage") against Thomas's MIC share, the possibility of Daniel wanting to sell his MIC interest, and Daniel potentially contesting a new will if it favored Thomas. Importantly, Johnston's attorneys had concerns regarding Thomas's presence during these consultations and the potential for undue influence. The attorneys recommended private discussions with Johnston that never materialized.

{¶6} Indeed, during deposition, Burkholder testified to Johnston's emotional struggle with potentially favoring Thomas and advised him to discuss any proposed changes with Daniel, which Johnston reportedly agreed to do but never did. Lucas provided Johnston with recommendations in November 2019 to minimize a will contest, including using a no-contest clause and independent witnesses. However, none of these suggestions were adopted in the 2020 will. Despite Johnston emailing Lucas in November 2019 stating his intent for Lucas to draft a new will, this never occurred, with Thomas later asserting Johnston decided to write the will himself to save on legal fees.

{¶7} Johnston's 2020 will, which is the focus of the dispute in this case, contained significant changes from his prior wills. The 2020 will devised 37.5 percent of his 50 percent share of MIC to Ann and 12.5 percent to Daniel, with a stated intent to "equalize" unencumbered ownership between the families. It also included a clause forgiving all debts owed to Johnston by both Thomas and Daniel.

The execution of the 2020 will at Thomas's office involved witnesses Jennifer Simpson ("Simpson") and Andrew Bittner ("Bittner") (Thomas's business associate), neither of whom had a clear independent recollection of seeing Johnston sign the document. Their testimonies also conflicted regarding who controlled the meeting as well as Johnston's demeanor. The will itself presented numerous physical irregularities in formatting, paper type, and printing that were not present in Johnston's prior homogenous estate documents, compounded by Thomas's inconsistent explanations regarding his possession of the original will, which was not revealed to Daniel or Johnston's attorneys for over a year.

{¶8} Thomas's management of assets also came under scrutiny. In 2017, Johnston sold his residence and approximately 35 acres to Pulte Homes for about $1.8 million, with a contract to reacquire his home and three acres later by reimbursing Pulte for property taxes. By December 2020, when the reacquisition was ready and taxes were due, Johnston had sufficient funds to complete the deal. However, Thomas, acting as attorney-in-fact while Johnston was in nursing care, transferred Johnston's remaining investment funds to his and Ann's accounts and instead executed a mortgage on Johnston's home to cover the taxes owed to Pulte. The mortgage was later paid from the sale of the home by the estate. Furthermore, after Johnston was hospitalized in late 2020, Thomas wrote several MIC distribution checks payable to Johnston, signed Johnston's name in a manner mimicking his Parkinson's-affected signature, deposited them into Johnston's account, and then

transferred these funds to his and Ann's account, totaling $19,500.00 from Johnston's MIC distributions.

**{¶9}** Johnston's will, which was executed on March 13, 2020, was admitted in the probate court on July 6, 2021.[1]  In accordance with Johnston's will, Thomas was appointed the executor of Johnston's estate.

**{¶10}** Subsequently, Daniel filed a complaint in the probate court in Johnston's estate on July 29, 2021 contesting the validity of the will under R.C. 2107.71, alleging it was fraudulent, procedurally defective, and the result of undue influence by Thomas.  Daniel also sought an accounting of Johnston's assets, which he claimed Thomas improperly handled while acting as Johnston's attorney-in-fact, and requested the retrieval of estate assets.  Furthermore, Daniel sought injunctive relief and the appointment of a special administrator.   Thomas, as executor of Johnston's estate, and the defendants filed answers on October 4, 2021, respectively.

*Executor and Inventory Disputes*

**{¶11}** On September 28, 2021, Thomas, in his role as executor, filed a claim seeking court approval for $14,992.68 in estate expenses.  On October 19, 2021, Daniel moved to remove Thomas as executor.  Thomas then agreed to resign, and following a joint motion by the parties, the probate court appointed a special administrator on December 30, 2021.  Due to the pending challenges to his role and

---

[1] The probate court rejected Thomas's first application to administer Johnston's estate, which was filed on June 23, 2021, because the will submitted with the application was not the original document and lacked original signatures.

-6-

the will, the probate court later ordered Thomas to reimburse the estate expenses for which he sought reimbursement to the estate account until the issues were resolved.

{¶12} Also on October 19, 2021, Daniel raised an exception to the inventory of Johnston's estate. He alleged that significant assets were omitted, including proceeds from the 2017 real property sale exceeding $1,400,000.00, various investment, bank, and trust accounts, and the valuation of Johnston's ownership interest in MIC. The special administrator later filed the estate inventory and appraisal on February 15, 2022, and an amended version on March 28, 2022, to which Daniel maintained his exceptions.

*Motions for Repayment of Personal Expenses*

{¶13} Several motions were filed concerning Thomas's use of Johnston's funds. On November 23, 2021, Daniel filed a motion requesting that Thomas repay Johnston's estate $19,787.54, alleging these funds were used for Thomas's personal expenses (charged to a Chase credit card) and to reimburse the estate for real estate agent fees paid to Ann for selling estate assets. Daniel amended this motion on January 5, 2022, increasing the requested repayment for the Chase credit card bill to $23,037.54. After the defendants opposed this motion, the parties filed an agreed entry on February 11, 2022, in which Thomas agreed to reimburse the estate the $23,037.54 for the personal charges on Johnston's Chase credit card. The issue of repaying Ann's real estate fees remained pending.

{¶14} On February 10, 2022, Daniel filed another motion, this time seeking an order for Thomas to repay Johnston's estate $49,891.00 for charges made to a Bank of America credit card. On March 2, 2022, the parties again filed an agreed entry, with Thomas consenting to reimburse Johnston's estate for these charges.

{¶15} Nevertheless, the issue of reimbursement continued, and on November 17, 2022, the probate court ordered Thomas to reimburse Johnston's estate $88,000.00 by November 21, 2022. When Thomas failed to make this payment, the special administrator filed a show cause motion on November 22, 2022 (and an amended motion the next day). Consequently, on November 23, 2022, the probate court ordered Thomas to appear on December 22, 2022 to show why he should not be held in contempt of court. Following the hearing, the probate court found Thomas in contempt of its prior order and sentenced him to 30 days in jail. However, this sentence was suspended, allowing Thomas the opportunity to purge his contempt by making the ordered payment, which he subsequently did.

*Summary Judgment*

{¶16} The dispute escalated with both parties filing motions for summary judgment on October 7, 2022. In Daniel's motion for summary judgment, he sought to invalidate the 2020 will—citing grounds of procedural defects, improper execution, undue influence, fraud, and forgery—and additionally requested an order for an accounting of funds that he alleged Thomas transferred from Johnston's accounts for personal use, and the retrieval of estate assets, arguing that Thomas's

inter vivos transfers resulted from wrongful concealment or embezzlement. In their competing motion for summary judgment, the defendants requested partial summary judgment, asserting the validity of the 2020 will and denying any undue influence, fraud, or procedural defects. Following these motions, Daniel filed a memorandum opposing the defendants' motion on October 13, 2022, and the defendants filed a memorandum opposing Daniel's motion on October 21, 2022. Replies were filed by both parties on October 28, 2022.

{¶17} On June 16, 2023, the probate court largely sided with Daniel, declaring Johnston's 2020 will invalid due to undue influence and also finding it inauthentic, citing irregularities and evidence of fraud. As a result, the probate court ordered the revocation of its prior admission of the 2020 will.[2] The probate court also determined that the defendants' self-dealing inter vivos transfers of assets since 2017 were invalid, found them guilty of wrongful concealment, embezzlement, and conveyance of these assets before the estate's creation, and ordered an accounting for their retrieval by the estate. However, the probate court sided with the defendants on Daniel's specific claim that the will contained procedural defects in its formal execution and witnessing.

---

[2] Following the revocation of the 2020 will, Johnston's 2005 will was admitted to the probate court on August 1, 2023.

*Estate Settlement*

**{¶18}** After the probate court's summary judgment decision, issues with accounting persisted. Thomas filed an accounting on July 24, 2023, to which Daniel and the special administrator filed objections in early August 2023. On August 23, 2023, the probate court ordered Thomas to provide further documentation relative to the accounting. Thus, Thomas filed an amended accounting on September 29, 2023, but on November 27, 2023, the probate court disallowed it as deficient and non-compliant, citing Thomas for failure to file a proper accounting and ordering him to do so by December 15, 2023.

**{¶19}** Amidst these ongoing accounting difficulties, the parties disputed the amounts subject to retrieval, the extent of damages, and the attorney fees. Nevertheless, they entered into a joint stipulation on December 12, 2023, in which Thomas acknowledged improperly transferring $1,375,302.00 from Johnston's Huntington Bank account between 2017 and 2021.

**{¶20}** Ultimately, on November 26, 2024, the probate court ordered the defendants to pay Johnston's estate $1,861,617.36; this total comprised $1,375,302.00 in stipulated embezzled funds plus an additional $486,315.36 assessed for lost capital growth. Based on the finding that the defendants were guilty of wrongful concealment, embezzlement, and conveyance of assets—a judgment the court specified could not be dischargeable in bankruptcy—Daniel was

separately awarded $186,161.74 as a statutory penalty and $281,685.58 for costs and attorney fees, with all amounts set to accrue post-judgment interest.

{¶21} On December 24, 2024, the defendants filed a notice of appeal. They raise three assignments of error for our review, which we will discuss together.

### First Assignment of Error

**The Probate Court erred when it granted summary judgment in favor of Daniel and found that the Will was fraudulent by weighing the evidence and making a credibility determination, which is an improper application of the Rule 56(C) standard.**

### Second Assignment of Error

**The Probate Court erred when it weighed the evidence to find that Thomas exerted undue influence upon Johnston where there were genuine issues of material fact that should have been presented to a jury.**

### Third Assignment of Error

**The Probate Court erred when it granted summary judgment, finding Thomas and Ann guilty of wrongful concealment, embezzlement, and conveyance of assets before creation of the estate, as well as retention of said assets (or the benefit thereof) following creation of the estate.**

{¶22} In their assignments of error, the defendants argue that the probate court erred by granting summary judgment in favor of Daniel by invaliding the 2020 will and by determining that they were guilty of wrongful concealment, embezzlement, and conveyance of assets. In particular, in their first assignment of error, the defendants contend that the probate court improperly invalidated the 2020 will as fraudulent by weighing evidence and making credibility determinations,

rather than recognizing genuine disputes of material fact. The defendants specifically argue in their second assignment of error that the probate court similarly erred by finding Thomas exerted undue influence, again by weighing evidence on an issue with contested facts that should have been decided by a jury. Finally, the defendants contend in their third assignment of error that the probate court wrongly applied R.C. 2109.50 and failed to follow proper statutory procedures in its summary judgment finding that they wrongfully concealed, embezzled, or conveyed estate assets.

*Standard of Review*

{¶23} We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000). Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994).

*Analysis*

{¶24} We will begin by discussing the defendants' arguments challenging the probate court's decision granting summary judgment in favor of Daniel as to his will contest claim. Within this discussion, we will first address the defendant's specific challenge to the probate court's finding that the will was procured by undue

influence, followed by an examination of the probate court's determination that the will was fraudulent. Finally, we will turn to the defendants' contention that the probate court erred by granting summary judgment in favor of Daniel as to his claim that the defendants wrongfully concealed, embezzled, or conveyed estate assets.

*Will Validity*

**{¶25}** "Generally speaking, admitting a written will to probate requires a court to determine, from the face of the document itself, that it was executed in compliance with the law." *In re Estate of Shaffer*, 2020-Ohio-6973, ¶ 11. *See also Buffenbarger v. Estate of Meyer*, 2023-Ohio-2760, ¶ 31 (4th Dist.) (noting that "in a will-contest action, an order that admits a will to probate 'is prima-facie evidence of the attestation, execution, and validity of the will'"), quoting R.C. 2107.74. "If a will bears all the signatures indicating due execution and attestation, the court must admit the will to probate irrespective of whether the will's validity could be challenged on other grounds." *In re Estate of Shaffer* at ¶ 12. "The court's role at the point of admission to probate is not to examine the validity of the will's contents but to verify that the document was validly executed." *Id.* at ¶ 13.

**{¶26}** Challenges to a will's validity may only be brought through a will contest action under R.C. 2107.71. *In re Elvin's Will*, 146 Ohio St. 448, 452-453 (1946). In a will contest action under R.C. 2107.71, the admission of a will to probate constitutes prima facie evidence of its attestation, execution, and validity, thereby establishing a rebuttable presumption that these legal requirements were

met. *Mastro v. Glavan*, 2011-Ohio-3628, ¶ 46 (11th Dist.). Once a rebuttable presumption arises, the party challenging the presumed fact bears the burden of producing evidence that either counterbalances the presumption or leaves the case in a state of equipoise. *Buffenbarger* at ¶ 31. The presumption is overcome and disappears only if such sufficient rebutting evidence is successfully introduced. *Id.* "Once the presumption of a will's validity arises, the burden of proof shifts to the will contestants to prove, by a preponderance of the evidence, that the will is invalid." *Id.*

*Undue Influence*

{¶27} "A will is invalid if it is the product of undue influence." *Id.* at ¶ 43. "'Undue influence occurs when the wishes and judgment of the transferor are substituted by the wishes and judgment of another.'" *Simon v. Aulino*, 2020-Ohio-6962, ¶ 22 (4th Dist.), quoting *Grimes v. Grimes*, 2009-Ohio-3126, ¶ 36 (4th Dist.). "'A testator is unduly influenced by another when the testator is restrained from disposing of property in accordance with his own wishes and instead substitutes the desires of another.'" *Buffenbarger* at ¶ 43, quoting *Riley v. Tizzano*, 2006-Ohio-6625, ¶ 20 (4th Dist.).

{¶28} "To establish undue influence in a will-contest action, the will contestant must prove by clear and convincing evidence: '(1) a susceptible testator, (2) another's opportunity to exert [undue influence], (3) the fact of improper influence exerted or attempted and (4) the result showing the effect of such

-14-

influence.'" *Id.*, quoting *Redman v. Watch Tower Bible & Tract Soc. of Pennsylvania*, 69 Ohio St.3d 98, 101 (1994). "Exercise of undue influence 'need not be shown by direct proof, but maybe inferred from the circumstances.'" *Simon* at ¶ 41, quoting *Calloway v. Roy*, 1977 WL 200400, *3 (10th Dist. Sept. 8, 1977).

{¶29} "'[G]eneral influence, however strong or controlling, is not undue influence unless brought to bear directly upon the act of making the will.'"" *Buffenbarger* at ¶ 43, quoting *Riley* at ¶ 25, quoting *West v. Henry*, 173 Ohio St. 498, 501 (1962). "'Further, "[t]he mere existence of undue influence, or an opportunity to exercise it, although coupled with an interest or motive to do so, is not sufficient, but such influence must be actually exerted on the mind of the testator with respect to the execution of the will in question.'" *Id.*, quoting *Riley* at ¶ 25.

{¶30} A will is not automatically presumed to be the result of undue influence merely because the testator distributes their property in a manner that appears unnatural, unjust, or unequal, even if that distribution significantly contradicts the testator's previously expressed sentiments or intentions toward his or her relatives or those who would typically be considered natural beneficiaries. *Id.* at ¶ 44. Thus, an unnatural, unjust, or unequal distribution of property in a will— or one that deviates from the testator's prior statements—is not, on its own, sufficient grounds to nullify the will. *Id.* Instead, for such a will to be invalidated, it must be demonstrated that undue influence was actually exerted upon the testator. *Id.* Any assessment of undue influence must focus on the circumstances existing

around the time the will was signed. *Id.* This relevant period includes the moment of execution itself, as well as a reasonable span of time immediately preceding and following that event. *Id.*

**{¶31}** "However, undue influence is *presumed* if the challenging party establishes a fiduciary or confidential relationship existed between the decedent and a beneficiary." (Emphasis added.) *Foelsch v. Farson*, 2020-Ohio-1259, ¶ 17 (5th Dist.). Where such a relationship exists, any property transfer from the donor to the donee is regarded with suspicion, specifically raising concerns that the donee may have exerted undue influence upon the donor. *Id.*

**{¶32}** "A fiduciary relationship is 'a relationship "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."'" *Ciszewski v. Kolaczewski*, 2013-Ohio-1765, ¶ 10 (9th Dist.), quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 442 (1996), quoting *In re Termination of Employment of Pratt*, 40 Ohio St.2d 107, 115 (1974). "A fiduciary's role may be assumed by formal appointment or may arise from a more informal confidential relationship, wherein 'one person comes to rely on and trust another in his important affairs and the relations there involved are not necessarily legal, but may be moral, social, domestic, or merely personal.'" *Foelsch* at ¶ 20, quoting *Craggett v. Adell Ins. Agency*, 92 Ohio App.3d 443, 451 (8th Dist. 1993).

-16-

{¶33} "A 'confidential relationship' exists '"whenever trust and confidence is placed in the integrity and fidelity of another."'" *Young v. Kaufman*, 2017-Ohio-9015, ¶ 58 (8th Dist.), quoting *Ryerson v. White*, 2014-Ohio-3233, ¶ 19 (8th Dist.), quoting *Golub v. Golub*, 2012-Ohio-2509, ¶ 33 (8th Dist.). "'A confidential relationship can be moral, social, domestic, or merely personal in nature.'" *Id.*, quoting *Diamond v. Creager*, 2002 WL 313137, *3 (2d Dist. Mar. 1, 2002). "The determination of whether a relationship is a confidential relationship is a question of fact dependent upon the circumstances in each case." *Id.* Generally, "[a] parent-child relationship in and of itself is insufficient to create a confidential or fiduciary relationship." *Id.* at ¶ 60. However, "'[t]he holder of a power of attorney has a fiduciary relationship with his or her principal and is not required to have used the power of attorney for a confidential or fiduciary relationship to arise.'" *Thomas v. Delgado*, 2022-Ohio-4235, ¶ 28 (3d Dist.), quoting *Young* at ¶ 57.

{¶34} "Where a presumption of undue influence arises based on the existence of a confidential or fiduciary relationship between a donor and a beneficiary, 'the burden of going forward with evidence' shifts to the beneficiary accused of exercising undue influence to show that his or her conduct was free from undue influence." *Young* at ¶ 59, quoting *Landin v. Lavrisiuk*, 2005-Ohio-4991, ¶ 23 (8th Dist.). To overcome this presumption, the beneficiary must demonstrate by a preponderance of the evidence that the donor acted voluntarily, exercised their own free will, and fully understood their actions and the resulting consequences.

*Id.*; *Wall-Meiring v. Gibson*, 2023-Ohio-664, ¶ 43 (6th Dist.). Nevertheless, "'the party attacking the transfer retains the ultimate burden of proving undue influence by clear and convincing evidence.'" *Young* at ¶ 59, quoting *Ament v. Reassure Am. Life Ins. Co.*, 2009-Ohio-36, ¶ 38 (8th Dist.).

{¶35} "'Clear and convincing evidence' is more than a preponderance of the evidence, but does not rise to the level of certainty required by the beyond a reasonable doubt standard in criminal cases." *Id.* at ¶ 52. "It is that measure or degree of proof that produces in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Id.* However, "[b]ecause 'the person who can give the best evidence is dead,' most evidence of undue influence 'will be circumstantial, leaving the factfinder to draw permissible inferences.'" *Id.*, quoting *Redman*, 69 Ohio St.3d at 102.

{¶36} In this case, the probate court concluded that there was no genuine issue of material fact that Johnston's 2020 will was the product of undue influence exerted by Thomas. Relevantly, the probate court determined that Johnston was a susceptible testator due to his advanced age (91), having Parkinson's Disease, hearing loss, and his complete reliance on Thomas for daily care, transportation, and communication, particularly after he stopped driving in 2019. Although Johnston's mental functioning was not found to be compromised, the probate court determined that these factors rendered him vulnerable.

{¶37} Importantly, the probate court found that Thomas had a clear opportunity to exert undue influence arising from both a confidential relationship (as Johnston's son providing extensive care) and a fiduciary relationship (as Johnston's attorney-in-fact since 2017).[3] Consequently, undue influence was presumed, and the burden shifted to Thomas to prove Johnston's decisions were free of such influence. In this case, the probate court found Thomas's explanations for the will's provisions significantly favoring him and Ann—such as Johnston being upset with Daniel or wanting to reward Thomas for his care—to be implausible and insufficient to overcome the presumption of undue influence, especially when contrasted with evidence of Johnston's long-standing intent to treat his sons equally and his documented relationship with Daniel.

{¶38} Notwithstanding this conclusion, the probate court further determined that Thomas actually exercised undue influence over Johnston. Critically, the probate court reasoned that, even though Johnston maintained testamentary capacity and an understanding of his financial affairs, Thomas's repeated withdrawals from Johnston's accounts created an "impossible dilemma," effectively forcing Johnston to include a significant debt forgiveness clause in the 2020 will. (June 16, 2023 JE at 42). Indeed, the probate court found that Johnston was aware of Thomas's extensive financial needs and his inability to repay these sums. Thus, the probate

---

[3] Thomas's fiduciary authority over specific investment accounts began in 2017 and a broader general durable power of attorney was executed in 2018.

court reasoned that the execution of the will on March 13, 2020, amid the early Covid-19 pandemic and potentially endangering Johnston's health, highlighted the acute pressure and need orchestrated by Thomas's influence.

{¶39} Finally, the probate court found that the 2020 will's terms clearly demonstrated the result of this undue influence. Significantly, the probate court found that the will drastically departed from Johnston's established pattern of treating his sons equally in prior estate plans, instead heavily favoring Thomas and Ann with provisions like the substantial debt forgiveness and an unequal distribution of Johnston's MIC interest. Notably, the probate court found the explanations for these changes, such as keeping the MIC farm in the family or protecting assets from Thomas's creditor, to be inconsistent with the MIC partnership agreement (which Johnston, as its drafter, understood) and previous legal advice. The probate court particularly viewed the debt forgiveness as a direct consequence of Thomas's financial actions, effectively disinheriting Daniel from funds Johnston likely intended for him.

{¶40} On appeal, the defendants argue that the probate court erred by granting summary judgment in favor of Daniel on the issue of undue influence primarily because the probate court improperly weighed evidence and made credibility determinations, rather than identifying genuine issues of material fact that should have been presented to a jury. Specifically, the defendants contend that the probate court wrongly concluded Johnston was a "susceptible testator" by

focusing on his age, physical infirmities, and reliance on Thomas, while failing to consider evidence of Johnston's competence and good health around the time the will was executed in March 2020, and that his significant health decline occurred months later. They argue Johnston's dependence on Thomas at most demonstrated an opportunity for influence, not inherent susceptibility.

{¶41} Furthermore, the defendants assert that the probate court improperly dismissed Thomas's evidence rebutting the presumption of undue influence by deeming his explanations "implausible." They claim that the undisputed evidence, including Burkholder's testimony about Johnston's independent statements, demonstrates that Thomas did not exert improper influence and that Johnston himself intended to favor Thomas in his will. The defendants maintain that an unequal property disposition alone does not prove undue influence without evidence that such influence was actually exercised, and that the probate court's finding relied on speculation rather than concrete proof.

{¶42} Daniel disputes the defendants' arguments, contending that the probate court correctly found that Thomas failed to present sufficient evidence to rebut the presumption of undue influence that arose from his confidential and fiduciary relationship with Johnston. Importantly, Daniel argues that Thomas's rebuttal, which primarily consists of his own self-serving narrative that Johnston acted freely out of love for Thomas and disappointment with Daniel, is contradicted by substantial evidence. Specifically, Daniel points to Johnston's long-standing and

documented history of treating his sons equally in all prior estate plans and evidence of their continued loving and supportive relationship through 2020, which makes the claim of a sudden intent to disinherit Daniel implausible.

{¶43} In addition to challenging the plausibility of that narrative, Daniel argues that overwhelming circumstantial evidence of Thomas's actual exertion of influence demonstrates precisely why Thomas failed to meet his burden of rebutting the presumption that Johnston's actions were not the product of his own free will. This evidence includes Thomas's pattern of withdrawing significant funds from Johnston's accounts, which effectively forced Johnston to include the debt forgiveness clause in the 2020 will. Daniel also highlights Thomas's control over Johnston's access to independent legal counsel—including managing communications with the attorneys at Isaac Wiles and ultimately halting the professional estate planning process—and the suspicious urgency of executing the will during the Covid-19 shutdown as further proof of Thomas's improper influence. Finally, Daniel argues the result of this influence is self-evident in the 2020 will itself, which drastically changed Johnston's estate plan from an equal 50/50 split to an 87/13 split in Thomas's favor, providing the clear effect of the unrebutted undue influence.

{¶44} Based on our de novo review of the record, construing the evidence in a light most favorable to the defendants, we conclude that the defendants failed to sufficiently rebut the presumption that Johnston's will was the product of undue

influence. While the will's admission to probate initially presumed its validity and placed the ultimate burden on Daniel to prove undue influence, a specific presumption of undue influence arose directly against Thomas. *See Hutchison v. Kaforey*, 2016-Ohio-3541, ¶ 38 (9th Dist.). This was due to the fiduciary relationship existing between Johnston and Thomas, stemming from Thomas's capacity as attorney-in-fact and the confidential nature of their relationship where Thomas managed Johnston's personal, financial, and health matters. Consequently, the burden shifted to Thomas to demonstrate by a preponderance of the evidence that Johnston acted voluntarily, with free will, and full understanding, thereby rebutting the presumption. *See Wall-Meiring*, 2023-Ohio-664, at ¶ 43 (6th Dist.). We conclude that Thomas presented insufficient evidence to meet this burden. That is, we conclude that Thomas's attempt to rebut the presumption did not create a genuine issue of material fact that would preclude a finding that the will was a product of undue influence. *See Meehan v. Meehan*, 2023-Ohio-2772, ¶ 51 (8th Dist.).

{¶45} Critically, "not every factual dispute precludes summary judgment. Rather, only disputes as to the *material* facts preclude summary judgment." (Emphasis added.) *Buffenbarger*, 2023-Ohio-2760, at ¶ 28 (4th Dist.), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (asserting that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment"). "'As to materiality, the

substantive law will identify which facts are material.'" *Id.*, quoting *Anderson* at 248.

**{¶46}** "Moreover, any disputed material facts must present *genuine issues*, meaning that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (Emphasis added.) *Id.* at ¶ 29, quoting *Anderson* at 248. "For this reason, the summary-judgment evidence must reveal more than 'some metaphysical doubt as to the material facts.'" *Id.*, quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Accordingly, if 'the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" *Id.*, quoting *Matsushita* at 587, quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968).

**{¶47}** Particularly, as evidence to rebut the presumption of undue influence, Thomas relied on his own affidavit and deposition testimony to assert that Johnston was aware of and authorized the financial transfers and intended the will's provisions out of love and a desire to support him and his family, while denying any manipulation. *See, e.g.*, *Stedke v. Hume Contracting, LLC*, 2025-Ohio-323, ¶ 30 (3d Dist.) (explaining the impact of self-serving assertions on motions for summary judgment). Nevertheless, to corroborate his assertions, Thomas pointed to the deposition testimonies of Burkholder and Lucas. While at first glance certain aspects of their testimonies—such as Johnston's perceived competence during meetings or his expressed desire to potentially favor Thomas—might appear to

support a triable issue as to whether Thomas overcame the presumption, a deeper review reveals that their testimonies, taken as a whole, bolster Daniel's claim of undue influence by highlighting Thomas's pervasive involvement and Johnston's isolation from independent counsel.

{¶48} For instance, Burkholder, who had a long-standing professional and personal relationship with Johnston (and who also represented Thomas individually concerning the Heritage lien on his MIC share), testified that he found Johnston competent during his interactions with him. Indeed, Burkholder affirmed Johnston's competence throughout their interactions, including during the complex, multi-year property sale to Pulte Homes which concluded around 2020. Notwithstanding that evidence, Burkholder's testimony also revealed critical underlying concerns.

{¶49} Importantly, during the October 1, 2019 estate planning meeting initiated for Johnston (which Thomas also attended), Burkholder pointedly expressed apprehension about Thomas's very presence and the potential for undue influence, stressing the unfulfilled need for counsel to speak with Johnston privately. As Johnston's health declined and his accessibility diminished in early 2020, Burkholder's communications regarding Johnston's affairs, including the Pulte property reconveyance, predominantly shifted to Thomas acting as Johnston's power of attorney. Even a rare private meeting between Burkholder and Johnston (believed to be after October 2019 for real estate document signing) underscores the

issues: Johnston emotionally discussed slightly favoring Thomas but agreed to Burkholder's strong advice to discuss these changes with Daniel first—a crucial step that was never taken. Significantly, Burkholder confirmed that neither he nor Lucas were consulted on the drastic MIC share redistribution or the substantial debt forgiveness clause that ultimately appeared in the 2020 will. Indeed, Burkholder remained entirely unaware of the 2020 will's existence until April 2021, long after Johnston's capacity to discuss it had waned.

{¶50} Similarly, Lucas's testimony, rather than aiding Thomas's rebuttal, further highlights Thomas's controlling influence. Specifically, Lucas confirmed his direct interaction with Johnston regarding the estate plan was limited to the single October 1, 2019 meeting, which Thomas also attended throughout. According to Lucas, Johnston's primary concerns voiced at this meeting were keeping the MIC farm in the family, Daniel possibly selling his share, and Thomas's significant MIC lien (over $1 million) potentially jeopardizing family ownership of the farm. According to Lucas, it was discussed that Johnston's MIC interest could potentially go to Ann to possibly shield it from Thomas's creditors.

{¶51} Critically, Lucas testified that Burkholder raised concerns about Thomas's potential undue influence during this meeting, prompting Lucas to memorialize in his own memo the necessity of speaking with Johnston *without Thomas present* to confidently assess the absence of undue influence. However, Lucas explicitly stated that such a private consultation with Johnston never occurred

with him. While Lucas testified that he did not perceive Thomas as influencing Johnston *during the October meeting* where Johnston spoke for himself and Johnston and Thomas "both talked about the same problems," Lucas also affirmed he had no way of knowing if Johnston was unduly influenced on the actual day the 2020 will was executed, as he was not present. (Lucas Depo. at 31). Moreover, Lucas testified that, although Johnston apparently stated Daniel would not contest a new will during the October meeting, Lucas noted in his memo at the time that he (Lucas) did not believe Johnston was entirely confident in that.

{¶52} Furthermore, Lucas testified that following their only meeting, Thomas became the primary, if not exclusive, conduit for communications regarding Johnston's estate planning with Isaac Wiles. Although Johnston directly emailed Lucas in November 2019 expressing a desire for Lucas to draft a will and promising an outline of his wishes, Lucas never received this outline, and no will was ever prepared by him. Instead of the promised outline from Johnston, the follow-up communications were from Thomas, who sent an email on Johnston's behalf adding several other specific estate issues for consideration, including noting that the Hamilton Capital account was a non-probate asset, that the will should cover the "whole estate plan," and that Lucas should attest to Johnston's competency. (*Id.* at 29).

{¶53} Ultimately, it was Thomas who formally halted the new estate plan. In a January 9, 2020 email Thomas instructed Lucas to put all estate planning work

on hold, ostensibly until Johnston provided the outline and Thomas's lien situation could be further clarified—a decision Lucas understood to be from both Johnston and Thomas. Lucas testified his involvement never progressed past this stage, confirming he was not engaged for any work beyond sending his initial November 4, 2019 letter providing "some thoughts" and recommendations. (*Id.* at 48).

{¶54} Additionally, Lucas confirmed that none of the specific recommendations that he provided to Johnston to address concerns about will contests or undue influence (such as a no-contest clause or using independent witnesses) were implemented in the 2020 will that later surfaced. He also testified that crucial and controversial provisions of the 2020 will, like the specific MIC share redistribution and the debt forgiveness clause, were never discussed with him during his engagement.

{¶55} In sum, in our view, Thomas's attempt to rebut the presumption of undue influence rests on his own self-serving denials, which are insufficient to create a genuine issue of material fact when they are not only uncorroborated but are actively undermined by the testimonies of the very attorneys upon which he relied. Decisively, rather than confirming Johnston's independent and uninfluenced intentions, the testimonies of Burkholder and Lucas detail a pattern of Thomas controlling the engagement and flow of information with legal counsel. This absence of independent, private interaction—a step both attorneys deemed important to rule out undue influence—combined with Thomas halting the

professional planning process and the eventual, secret appearance of the 2020 will containing drastic terms unknown to counsel, substantiates, rather than rebuts, the presumption of undue influence. Indeed, the manner in which the 2020 will eventually came to light—13 months after its purported execution (via Thomas)—and initially as a copy that the probate court rejected—further erodes any claim of a transparent, testator-driven process and supports Daniel's claim.

{¶56} Even so, the defendants claim that the probate court improperly applied a credibility assessment to reach the conclusion that summary judgment was proper in favor of Daniel on the issue of undue influence. "Generally, issues of witness credibility are outside the scope of the summary judgment proceeding." *Bevier v. Pfefferle*, 1999 WL 961409, *4 (6th Dist. Oct. 22, 1999). However, contrary to the defendants' contention, our review of the record reveals that the probate court did not improperly weigh or judge the credibility of the witnesses when determining that summary judgment was appropriate in favor of Daniel on his undue influence claim. *Accord Foelsch*, 2020-Ohio-1259, at ¶ 27 (5th Dist.). Instead, the probate court fulfilled its proper summary judgment function by determining that the evidence Thomas presented was legally insufficient to create a *genuine* issue of material fact regarding his rebuttal of the presumed undue influence. *See id.*

{¶57} Therefore, even though Thomas presented a competing factual narrative—that Johnston acted freely out of love and gratitude—this did not create

a *genuine* issue of material fact that would preclude summary judgment on the issue of undue influence. Indeed, Thomas's rebuttal rests almost entirely on his own uncorroborated, self-serving testimony. Our review of the record, even in a light most favorable to the defendants, reveals that Thomas's narrative is so contradicted by the objective circumstantial evidence detailing Thomas's control over the estate planning process, Johnston's isolation from independent counsel, and the secret creation of the 2020 will with terms unknown to anyone involved, that it fails to establish a *genuine* dispute. Consequently, no reasonable jury could find that Thomas met his burden to rebut the presumption when his claims are rendered implausible by the testimony of Burkholder and Lucas.

{¶58} Moreover, our de novo review of the record reflects that there is no genuine issue of material fact that Daniel further carried his burden of proving undue influence. Indeed, in addition to the evidence outlining Thomas's conduct and influence over Johnston, the product of Thomas's improper influence is self-evident in the 2020 will itself, which greatly benefitted the defendants.

{¶59} For these reasons, because the record taken as a whole could not lead a rational trier of fact to find for Thomas, no genuine issue for trial exists on the issue of undue influence. Accordingly, we conclude that the probate court did not err by granting summary judgment in favor of Daniel as to his claim for undue influence.

*Will Authenticity*

**{¶60}** "In Ohio, a will must meet certain statutory requirements before it can be admitted to probate." *In re Estate of Hand*, 2016-Ohio-7437, ¶ 12 (12th Dist.).

> In order to be valid, a will must be (1) in writing, (2) signed at the end by the testator or by some other person in the testator's conscious presence and at the testator's express direction, and (3) attested and subscribed in the conscious presence of the testator by two or more competent witnesses who saw the testator subscribe or heard the testator acknowledge the testator's signature.

*Id.*, citing R.C. 2107.03. *See also In re Estate of Shaffer*, 2020-Ohio-6973, at ¶ 13 ("The standards of R.C. 2107.24 provide a narrow exception to the formalities required in R.C. 2107.03, primarily by excusing a witness's failure to sign the will."). "'[C]onscious presence' means within the range of any of the testator's senses, excluding the sense of sight or sound that is sensed by telephonic, electronic, or other distant communication." R.C. 2107.03.

**{¶61}** "To attest and subscribe involves 'two acts: (1) an "act of the senses" by personally observing the signing or acknowledgment of signature by the testator and (2) a physical act of signing the document, under the observation of the testator, to prove that the attestation occurred.'" *Buffenbarger*, 2023-Ohio-2760, at ¶ 34 (4th Dist.), quoting *In re Estate of Shaffer* at ¶ 17. "A competent witness within the meaning of R.C. 2107.03 is a witness who 'satisfies the elements of R.C. 2317.01.'" *Id.*, quoting *In re Estate of Shaffer* at ¶ 16. R.C. 2317.01 provides that "[a]ll persons are competent witnesses except those of unsound mind and children under ten years

of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

**{¶62}** Moreover, "the language of the will must 'illustrate, at the minimum, a testamentary intent, i.e., a disposition of property to take effect only at death.'" *In re Estate of Rickels*, 2003-Ohio-5125, ¶ 4 (3d Dist.), quoting *In re Estate of Ike*, 7 Ohio App.3d 87 (1982), paragraph one of the syllabus. The "testamentary intent" necessary to establish that a document is actually a will is different from the decedent's separate intent regarding how specific provisions or gifts within that will should be interpreted or carried out. *In re Estate of Shaffer* at ¶ 26.

**{¶63}** In this case, the probate court determined that Johnston's 2020 will formally complied with the legal requirements for attestation, subscription, and witness competency, specifically rejecting Daniel's contention that Bittner was incompetent due to his relationship with the defendants. However, when applying the summary judgment standard to the 2020 will's overall authenticity, the probate court granted summary judgment in favor of Daniel after determining that there was no genuine issue of material fact that the 2020 will was fraudulent and inauthentic.

**{¶64}** Specifically, the probate court analyzed that the 2020 will's abnormalities included significant physical and formatting inconsistencies between the document's pages (such as differing paper types, fonts, margins, and printing irregularities suggesting pages were not created contemporaneously), content that starkly contradicted Johnston's known intentions and the specific legal advice that

he had sought to prevent a will contest, and the suspicious circumstances surrounding the will's handling, custody, and delayed presentation. In sum, the probate court resolved that the pages of the document were not contemporaneously adopted by Johnston and that the will admitted to probate was different from the same one he executed.

{¶65} On appeal, the defendants contend that the probate court erred by granting summary judgment in favor of Daniel as to the validity of the 2020 will because the probate court overstepped by weighing evidence and making its own credibility determinations, essentially "playing detective" regarding the will's physical characteristics, such as formatting and paper types, and its chain of custody. Relevantly, the defendants contend that there was no direct or forensic evidence proving the will was a forgery or fake. Instead, they argue that the probate court drew speculative inferences while disregarding plausible explanations for any irregularities, such as Johnston, a 90-year-old with tremors, having typed the will himself. Furthermore, they claim that the probate court ignored the evidence in the record, including witness authentication of their signatures on the will beneath a proper attestation clause, and Thomas's testimony about Johnston's preparation of the document, when determining that no triable issue remained as to the 2020 will's authenticity.

{¶66} Daniel disputes the defendants' arguments, contending that the probate court correctly determined that the totality of the evidence defeated the 2020

will's validity. He emphasizes that this evidence, as the probate court found, included an "unprecedented mix of abnormalities" personally observed in the original document, as well as suspicious circumstances surrounding Thomas's handling, storage, and delayed revelation of the will. Importantly, Daniel argues that Thomas's explanations and self-serving affidavit were wholly insufficient and implausible to counter these overwhelming indicators of fraud, thus justifying the probate court's conclusion that the document admitted to probate was not Johnston's authentic will and that reasonable minds could only find it fraudulent.

**{¶67}** However, based on our determination that the probate court did not err by granting summary judgment in favor of Daniel as to his undue influence claim, as there is no genuine issue of material fact that the 2020 will was the product of such influence, we need not address the defendants' separate assignment of error concerning the will's authenticity. *See* App.R. 12(A)(1)(c).

*Wrongful Concealment, Embezzlement, Conveyance of Estate Assets*

**{¶68}** In its June 16, 2023 judgment entry granting summary judgment in favor of Daniel, the probate court found clear and convincing evidence that the defendants were guilty of wrongful concealment, embezzlement, and conveyance of assets before the creation of Johnston's estate under to R.C. 2109.50. Specifically, the probate court's analysis focused on Thomas's wrongful or culpable conduct while acting as Johnston's attorney-in-fact, particularly his transfer of over $1.6 million from Johnston's accounts to himself and his family from 2017 to 2021.

Indeed, the probate court found that Thomas's repeated promises to financial advisors to replenish these funds demonstrated bad faith, as he had neither the intent nor the ability to repay, and that these actions constituted embezzlement and wrongful conveyance. Thus, the probate court declared the transfers made by Thomas void.

{¶69} In their third assignment of error, the defendants argue that the probate court erred by finding them guilty of wrongful concealment, embezzlement, and conveyance of assets under R.C. 2109.50. Their primary contention is that the statute does not apply because the funds in question originated from non-probate assets—a transfer on death ("TOD") investment account and a joint and survivorship bank account—which would not have rightfully belonged to Johnston's estate upon his death. Alternatively, they argue that even if the statute is applicable, its quasi-criminal nature requires a trial to determine guilt, making a summary judgment ruling on the matter procedurally improper. Finally, the defendants assert that genuine issues of material fact exist as to whether Thomas's conduct was wrongful, contending that the evidence shows Johnston was fully aware of and authorized the financial transfers as support for his family, thus negating any claim of concealment or embezzlement.

{¶70} In response, Daniel argues that the probate court correctly applied R.C. 2109.50 to find the defendants guilty of wrongful concealment, embezzlement, and conveyance, and to order the retrieval of those assets. He contends that the

defendants' primary argument—that the funds were non-probate assets and thus beyond the statute's reach—fails because Thomas, acting as attorney-in-fact for Johnston, engaged in presumptively invalid self-dealing when he transferred the assets to himself and his family. Moreover, Daniel asserts that even if the funds were in accounts designated as non-probate assets, the probate court has the authority to invalidate the inter vivos transfers themselves. That is, he contends that, once invalidated, the funds rightfully belonged to the estate and were retrievable under a concealment action. Furthermore, Daniel maintains that, because Thomas stipulated to transferring $1,375,302.00 of Johnston's assets for his family's benefit and failed to rebut the presumption that these self-dealing transfers were invalid, the probate court correctly found him guilty and ordered the funds returned to the estate.

{¶71} "The probate court is a court of limited jurisdiction, and therefore it can only exercise jurisdiction when authority is expressly construed by statute." *Lamar v. Washington*, 2006-Ohio-1414, ¶ 15 (3d Dist.). *See also* R.C. 2101.24. While the powers of the probate division are plenary, they extend only to matters that are properly before the court. *In re Estate of Harmon*, 2016-Ohio-2617, ¶ 24 (5th Dist.). The probate division's plenary, or complete, powers are extensive, but they cannot be used to expand the court's jurisdiction beyond the types of cases it is specifically authorized to hear by statute. *Id.*

{¶72} "Specifically, pursuant to R.C. 2109.50, an executor or other interested person may file a complaint in the probate court 'against any person suspected of having concealed, embezzled, or conveyed away or of being or having been in the possession of any moneys, personal property, or choses in action of the estate . . . ." *Id.* at ¶ 25, quoting R.C. 2109.50. A "R.C. 2109.50 proceeding for the discovery of concealed or embezzled assets of an estate is a special proceeding of a summary, inquisitorial character whose purpose is to facilitate the administration of estates by summarily retrieving assets that rightfully belong there." *State v. Harmon*, 2017-Ohio-320, ¶ 14 (5th Dist.). "In essence, 'the inquiry under R.C. 2109.50 focuses on the ownership of the asset and whether possession of the asset is being impermissibly concealed or withheld from the estate.'" *In re Estate of Harmon* at ¶ 26, quoting *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 407 (9th Dist. 1993).

{¶73} Likewise, R.C. 2109.52 empowers the probate court in a concealment proceeding to conduct a hearing where it may determine questions of title to the assets and decide whether the accused is guilty of concealment, embezzlement, or conveyance. *Harmon* at ¶ 15. If the person is found guilty, the statute then directs the court to enter a judgment against them for the value of the assets, plus a ten percent penalty. *Id.*

{¶74} Under R.C. 2109.50 and 2109.52, a probate court has the authority "'to recover certain assets wrongfully concealed, embezzled, or conveyed away before

the creation of the estate.'" *In re Estate of Rotilio*, 2013-Ohio-2878, ¶ 11 (7th Dist.), quoting *Goldberg v. Maloney*, 2006-Ohio-5485, ¶ 33. Importantly, a probate court's jurisdiction extends to non-probate assets if it determines the underlying inter vivos transfer was invalid, making the property retrievable under R.C. 2109.50. *Goldberg* at ¶ 34. Indeed, "[a] probate court has jurisdiction over an action brought pursuant to R.C. 2109.50 to recover funds passed to a third party by inter vivos transaction where the validity of the underlying transfer is challenged." *Burwell v. Rains*, 2005-Ohio-1893, ¶ 15 (11th Dist.). That is, "[a] probate court has jurisdiction to entertain an action against an attorney-in-fact for concealed or embezzled assets withdrawn with a power of attorney." *Id.*

{¶75} In this case, after reviewing the evidence available in the record, we conclude that the probate court properly exercised its jurisdiction to determine that the defendants were guilty of wrongful concealment, embezzlement, and conveyance of assets under R.C. 2109.50 even though the underlying assets were non-probate assets. *See Fox v. Stockmaster*, 2002-Ohio-2824, ¶ 63 (3d Dist.) (resolving "that the probate court had jurisdiction to entertain an action for concealed or embezzled assets under 2109.50" "for actions by an attorney in fact committed during the life of the decedent"). This jurisdiction applies because the central issue is not the nature of the accounts themselves, but rather the pre-death, inter vivos transfers from those accounts, which Thomas effectuated while acting in his fiduciary capacity as Johnston's attorney-in-fact. *See In re Estate of Harmon*,

2016-Ohio-2617, at ¶ 29 (5th Dist.) (explaining that a probate court has jurisdiction under R.C. 2109.50 over non-probate assets, such as those in a TOD account, when it finds the inter vivos transfers from that account were themselves wrongful and invalid, thereby making the assets retrievable by the estate). Thus, the defendants' argument that the non-probate nature of the original accounts shielded the assets from a concealment action fails as a matter of law.

{¶76} We further reject the defendants' contention that the quasi-criminal nature of an R.C. 2109.50 action automatically requires a trial and precludes summary judgment. *See In re Estate of Beatley v. Fisher*, 2024-Ohio-5109, ¶ 21 (10th Dist.). Critically, while an action under R.C. 2109.50 is considered quasi-criminal because it involves a charge of wrongful conduct, it is *not* a criminal prosecution. *Harmon*, 2017-Ohio-320, at ¶ 16 (5th Dist.). Indeed, the Supreme Court of Ohio has clarified that despite this characterization, the proceeding is a special action to recover assets, not to litigate a criminal act. *Id.* In other words, it is intended solely to provide a speedy and effective method for the probate court to discover assets belonging to the estate and to promptly secure those assets for the purpose of administration. *Id.*

{¶77} Since there is no absolute right to a trial where no genuine issue of material fact exists for a jury to consider, we conclude that the probate court did not err by resolving this issue at the summary judgment stage. *Accord In re Estate of Harmon* at ¶ 35. *See also In re Estate of Popp*, 94 Ohio App.3d 640, 649 (8th Dist.

1994) ("Summary judgment, being one of the procedures available in the probate court in the adjudication of cases, may be used in an R.C. 2109.50 proceeding if all the elements apply.").

**{¶78}** Finally, we conclude that there is no genuine issue of material fact that the defendants are guilty of concealment, embezzlement, or conveyance of assets. That is, we conclude there is no triable issue that the defendants wrongfully conveyed assets originating from Johnston's Hamilton Capital investment accounts by transferring them out of his Huntington Bank account for their own use. In particular, the evidence in this case revealed that Thomas (from 2017-2021), acting as Johnston's attorney-in-fact, directed the transfer of assets (belonging to Johnston) that resulted in a final judgment against him and his wife for $1,861,617.36 owed to the estate.[4] These transfers primarily originated from Johnston's Hamilton Capital investment account and were moved into Johnston's Huntington Bank checking account.

**{¶79}** The evidence in the record reveals that the transfers from the Hamilton Capital investment account were characterized by a "withdrawal and promise to replenish" cycle, which involved Thomas repeatedly demanding transfers from Johnston's account by emailing Hamilton Capital with promises to replenish the funds—promises the record indicates he had neither the intention nor the ability to

---

[4] This sum is composed of two parts: the $1,375,302.00 in funds that the parties stipulated were embezzled, plus an additional $486,315.36 that the probate court assessed for lost capital growth.

keep. This pattern began with the very first withdrawal in November 2017, just one month after the account was opened, at which time Thomas's son, Andrew, was the financial advisor managing the account. These repeated requests did not go unnoticed by the financial firm; internal emails from a Hamilton Capital employee to supervisor Eric Marquardt ("Marquardt") in early 2019 noted that "something seems strange" and that Thomas's withdrawal requests were "starting to come almost weekly," questioning if they raised a concern. (Marquardt Depo. at 57, 62).

{¶80} "The analysis of a R.C. 2109.50 claim begins with whether the complainant has established a prima facie case of concealment by a preponderance of the evidence." *Lance v. Boldman*, 2018-Ohio-44, ¶ 37 (9th Dist.). *See also id.* at ¶ 34 (observing that "the complainant must prove more than 'mere possession' of the estate assets"), quoting *Longworth v. Childers*, 2008-Ohio-4927, ¶ 21 (2d Dist.); *In re Estate of Harmon*, 2016-Ohio-2617, at ¶ 42 (5th Dist.) (clarifying that "R.C. 2109.52 . . . does not require the complaining party to establish fraud or undue influence"). If the complaint establishes a prima face case of concealment, "then, the respondent may rebut and overcome the prima facie case of concealment by presenting clear and convincing evidence of 'a present intention on the part of the donor to make a gift' to the suspected person." *Lance* at ¶ 37, quoting *Brooks v. Bell*, 1998 WL 165024, *4 (1st Dist. Apr. 10, 1998). To prove a valid inter vivos gift, the recipient must show that the donor intended to transfer title and possession,

and that this intent was fulfilled through the actual delivery of the property and the complete surrender of all ownership, dominion, and control. *Id.*

{¶81} Based on our review of the record before us, we conclude that the probate court did not err by granting summary judgment in favor of Daniel after determining that there was no genuine issue of material fact that the defendants were guilty of wrongful concealment, embezzlement, and conveyance of assets. Indeed, Daniel established a prima facie case of concealment and wrongful conveyance by presenting evidence that Thomas used his fiduciary position as Johnston's attorney-in-fact to transfer significant estate assets to himself, an act of self-dealing that is presumptively improper.

{¶82} A power of attorney is a written document that authorizes an agent, known as an attorney-in-fact, to perform specific acts on behalf the principal. *Id.* at ¶ 35. "The power of attorney creates a fiduciary relationship between the attorney-in-fact and the principal." *Id.* "Because '[t]he holder of a power of attorney has a fiduciary relationship with the principal,' the 'fiduciary relationship imposes a duty of loyalty to the principal.'" *Thomas*, 2022-Ohio-4235, at ¶ 28 (3d Dist.), quoting *Temple v. Temple*, 2015-Ohio-2311, ¶ 29 (3d Dist.). "'The law is zealous in guarding against abuse of such a relationship.'" *Id.* at ¶ 29, quoting *Bacon v. Donnet*, 2003-Ohio-1301, ¶ 30 (9th Dist.). "Any transfer of property from a principal to his attorney-in-fact is viewed with some suspicion." *Id.*, quoting *Bacon* at ¶ 30. "Indeed, 'attorneys-in-fact act outside the scope of their authority when

-42-

they use a general, durable power of attorney to make gifts to themselves.'" *Id.*, quoting *MacEwen v. Jordan*, 2003-Ohio-1547, ¶ 11 (1st Dist.).

**{¶83}** "Importantly, 'a general, durable power of attorney does not authorize attorneys-in-fact to transfer the principal's property to themselves or to others, unless the power of attorney explicitly confers this power.'" *Id.* at ¶ 30, quoting *MacEwen* at ¶ 12. *See also Hutchings v. Hutchings*, 2019-Ohio-5362, ¶ 28 (6th Dist.) (observing that "without the express authority to self-deal, any transfer of assets using a power of attorney [is] presumptively invalid"); *Temple* at ¶ 29; R.C. 2109.44. "'This rule applies to both transfers made to the attorney-in-fact and gifts to third parties.'" *Thomas* at ¶ 30, quoting *Lance* at ¶ 38. "'In such a case, the attorney-in-fact is obligated to demonstrate the fairness of his conduct.'" *Id.*, quoting *Bacon* at ¶ 30.

**{¶84}** "'Notwithstanding any express authority included in a power of attorney to make gifts to oneself and to create trusts, a fiduciary remains subject to a standard of care.'" *Id.* at ¶ 31, quoting *Bacon* at ¶ 44. "'The fiduciary, therefore, continues to be bound by the overriding duty of loyalty to act for the benefit of the principal and *not* for the benefit of himself.'" (Emphasis added.) *Id.*, quoting *Bacon* at ¶ 44. "'Any gifts must be made in the best interests of the principal and solely to further the interests of the principal, even at the expense of the agent's interests.'" *Id.*, quoting *Bacon* at ¶ 44. "That is, '[a] fiduciary may not use the special

confidence and trust which a fiduciary duty imposes to acquire or retain property for himself.'" *Id.*, quoting *Bacon* at ¶ 45.

{¶85} "When 'determining the validity of such a transfer, a court must first look to the express grant of authority in the text of the power of attorney. Absent that grant, the transfer is presumptively invalid.'" *Id.* at ¶ 33, quoting *MacEwen* at ¶ 14.

> "A court must next look to other considerations, based upon the unique facts of the case, which may include whether a transfer depleted assets necessary to maintain the principal's lifestyle; whether the principal knew of the gift and authorized it in some manner; whether the recipient of the transfer was the natural object of the principal's bounty and affection; whether the transfer was consistent with the principal's estate plan; whether the gift was a continuation of the principal's pattern of making gifts; and whether the transfer was made for another legitimate goal, such as the reduction of estate taxes."

*Id.*, quoting *MacEwen* at ¶ 14.

{¶86} Here, it is undisputed that Thomas served as Johnston's attorney-in-fact under a general durable power of attorney (executed in 2018) that did not expressly grant him the authority to make inter vivos gifts to himself or to third parties.[5] Consequently, the transfers were presumptively invalid and Thomas was required to prove the fairness of his conduct. *Accord Mancz v. McHenry*, 2012-Ohio-3285, ¶ 52 (2d Dist.); *Lance* at ¶ 42.

---

[5] Under a 2017 non-durable power of attorney for the Schwab account, while Thomas had the authority to transfer funds, including to himself, this power did not grant him the authority to engage in self-dealing transactions that were not in Johnston's best interest or that violated his overriding fiduciary duty of loyalty.

**{¶87}** To rebut the presumption of invalid self-dealing, the defendants pointed to Thomas's own affidavit as well as his own and Ann's self-serving testimony, asserting that Johnston was fully aware of and authorized all transactions. *Compare Thomas*, 2022-Ohio-4235, at ¶ 39 (3d Dist.) (noting that the only evidence presented to justify the fiduciary's self-dealing transfers consisted of the fiduciary's own self-serving statements asserting the decedent had instructed him to make the gifts). They supported their assertion by pointing to bank statements mailed to Johnston's home and the existence of a 2019 promissory note, characterizing the transfers at different times as either gifts or loans.

**{¶88}** However, this evidence, even when viewed in a light most favorable to the defendants, is insufficient to create a genuine issue of material fact regarding the fairness and validity of Thomas's self-dealing conduct. To begin with, the defendants' position on appeal is arguably rendered untenable by their own post-judgment stipulation. In that filing, the parties stipulated that Thomas improperly transferred $1,375,302.00 from Johnston's account to his family and waived any right to argue that the amount retrievable by the estate was less. Importantly, by stipulating to the amount that was improperly transferred and must be returned, the defendants potentially conceded the existence of the wrongful conveyance that is the core of the R.C. 2109.50 claim, thereby extinguishing the factual dispute they now raise.

{¶89} Nevertheless, even if we set aside the stipulation and analyze only the evidence before the probate court at the time of its summary judgment determination, Thomas failed to present sufficient evidence to rebut the presumption of invalid self-dealing. Decisively, Thomas's shifting characterization of the funds undermines his position. That is, the "gift" theory is contradicted by the lack of any corroborating evidence, such as gift tax returns, which Johnston, a seasoned attorney, would have known to file for such large sums. Similarly, the "loan" theory is undermined by the 2019 promissory note itself, which documented only a fraction of the amount transferred, suggesting the vast majority of funds were not part of an open and acknowledged loan arrangement. Furthermore, merely showing that bank statements were mailed to Johnston's home does not establish his informed consent or ratify the fiduciary's self-dealing, particularly given Johnston's documented reliance on Thomas for his daily affairs. Thus, because Thomas's self-serving explanations are inconsistent and not supported by sufficient objective evidence to prove the fairness of his conduct, the defendants failed to meet their burden to rebut the presumption that the transfers were invalid.

{¶90} Therefore, based on our de novo review of the record, and after construing the facts in light most favorable to the defendants (as we are required to do), we conclude that no genuine issues of material fact remain as whether the defendants are guilty of wrongful concealment, embezzlement, and conveyance of assets. Accordingly, we conclude that the probate court did not err by granting

summary judgment in favor of Daniel as to his wrongful concealment, embezzlement, and conveyance of assets claim.[6]

**{¶91}** The defendants' assignments of error are overruled.

**{¶92}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the probate court.

***Judgment Affirmed***

**MILLER and WILLAMOWSKI, J.J., concur.**

---

[6] The defendants contend within their third assignment of error that the probate court exhibited judicial bias that violated their due process rights. However, because the defendants failed to properly assign this issue as error, we decline to address the argument. *See* App.R. 16(A)(3).

Case No. 14-24-47

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

_____
William R. Zimmerman, Judge


_____
Mark C. Miller, Judge


_____
John R. Willamowski, Judge

DATED:
/hls

-48-